403 U.S. 388 (1971)
BIVENS
v.
SIX UNKNOWN NAMED AGENTS OF FEDERAL BUREAU OF NARCOTICS.
No. 301.
Supreme Court of United States.
Argued January 12, 1971
Decided June 21, 1971
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.
Stephen A. Grant argued the cause and filed a brief for petitioner.
Jerome Feit argued the cause for respondents. On the brief were Solicitor General Griswold, Assistant Attorney General Ruckelshaus, and Robert V. Zener.
Melvin L. Wulf filed a brief for the American Civil Liberties Union as amicus curiae urging reversal.
*389 MR. JUSTICE BRENNAN delivered the opinion of the Court.
The Fourth Amendment provides that:
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."
In Bell v. Hood, 327 U. S. 678 (1946), we reserved the question whether violation of that command by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct. Today we hold that it does.
This case has its origin in an arrest and search carried out on the morning of November 26, 1965. Petitioner's complaint alleged that on that day respondents, agents of the Federal Bureau of Narcotics acting under claim of federal authority, entered his apartment and arrested him for alleged narcotics violations. The agents manacled petitioner in front of his wife and children, and threatened to arrest the entire family. They searched the apartment from stem to stern. Thereafter, petitioner was taken to the federal courthouse in Brooklyn, where he was interrogated, booked, and subjected to a visual strip search.
On July 7, 1967, petitioner brought suit in Federal District Court. In addition to the allegations above, his complaint asserted that the arrest and search were effected without a warrant, and that unreasonable force was employed in making the arrest; fairly read, it alleges as well that the arrest was made without probable cause.[1] Petitioner claimed to have suffered great humiliation, *390 embarrassment, and mental suffering as a result of the agents' unlawful conduct, and sought $15,000 damages from each of them. The District Court, on respondents' motion, dismissed the complaint on the ground, inter alia, that it failed to state a cause of action.[2] 276 F. Supp. 12 (EDNY 1967). The Court of Appeals, one judge concurring specially,[3] affirmed on that basis. 409 F. 2d 718 (CA2 1969). We granted certiorari. 399 U. S. 905 (1970). We reverse.

I
Respondents do not argue that petitioner should be entirely without remedy for an unconstitutional invasion of his rights by federal agents. In respondents' view, however, the rights that petitioner assertsprimarily rights of privacyare creations of state and not of federal law. Accordingly, they argue, petitioner may obtain money damages to redress invasion of these rights only by an action in tort, under state law, in the state courts. In this scheme the Fourth Amendment would serve merely to limit the extent to which the agents could defend *391 the state law tort suit by asserting that their actions were a valid exercise of federal power: if the agents were shown to have violated the Fourth Amendment, such a defense would be lost to them and they would stand before the state law merely as private individuals. Candidly admitting that it is the policy of the Department of Justice to remove all such suits from the state to the federal courts for decision,[4] respondents nevertheless urge that we uphold dismissal of petitioner's complaint in federal court, and remit him to filing an action in the state courts in order that the case may properly be removed to the federal court for decision on the basis of state law.
We think that respondents' thesis rests upon an unduly restrictive view of the Fourth Amendment's protection against unreasonable searches and seizures by federal agents, a view that has consistently been rejected by this Court. Respondents seek to treat the relationship between a citizen and a federal agent unconstitutionally exercising his authority as no different from the relationship *392 between two private citizens. In so doing, they ignore the fact that power, once granted, does not disappear like a magic gift when it is wrongfully used. An agent actingalbeit unconstitutionallyin the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own. Cf. Amos v. United States, 255 U. S. 313, 317 (1921); United States v. Classic, 313 U. S. 299, 326 (1941). Accordingly, as our cases make clear, the Fourth Amendment operates as a limitation upon the exercise of federal power regardless of whether the State in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen. It guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority. And "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." Bell v. Hood, 327 U. S., at 684 (footnote omitted); see Bemis Bros. Bag Co. v. United States, 289 U. S. 28, 36 (1933) (Cardozo, J.); The Western Maid, 257 U. S. 419, 433 (1922) (Holmes, J.).
First. Our cases have long since rejected the notion that the Fourth Amendment proscribes only such conduct as would, if engaged in by private persons, be condemned by state law. Thus in Gambino v. United States, 275 U. S. 310 (1927), petitioners were convicted of conspiracy to violate the National Prohibition Act on the basis of evidence seized by state police officers incident to petitioners' arrest by those officers solely for the purpose of enforcing federal law. Id., at 314. Notwithstanding the lack of probable cause for the arrest, id., at 313, it would have been permissible under state law if effected *393 by private individuals.[5] It appears, moreover, that the officers were under direction from the Governor to aid in the enforcement of federal law. Id., at 315-317. Accordingly, if the Fourth Amendment reached only to conduct impermissible under the law of the State, the Amendment would have had no application to the case. Yet this Court held the Fourth Amendment applicable and reversed petitioners' convictions as having been based upon evidence obtained through an unconstitutional search and seizure. Similarly, in Byars v. United States, 273 U. S. 28 (1927), the petitioner was convicted on the basis of evidence seized under a warrant issued, without probable cause under the Fourth Amendment, by a state court judge for a state law offense. At the invitation of state law enforcement officers, a federal prohibition agent participated in the search. This Court explicitly refused to inquire whether the warrant was "good under the state law . . . since in no event could it constitute the basis for a federal search and seizure." Id., at 29 (emphasis added).[6] And our recent decisions regarding electronic surveillance have made it clear beyond peradventure that the Fourth Amendment is not tied to the *394 niceties of local trespass laws. Katz v. United States, 389 U. S. 347 (1967); Berger v. New York, 388 U. S. 41 (1967); Silverman v. United States, 365 U. S. 505, 511 (1961). In light of these cases, respondents' argument that the Fourth Amendment serves only as a limitation on federal defenses to a state law claim, and not as an independent limitation upon the exercise of federal power, must be rejected.
Second. The interests protected by state laws regulating trespass and the invasion of privacy, and those protected by the Fourth Amendment's guarantee against unreasonable searches and seizures, may be inconsistent or even hostile. Thus, we may bar the door against an unwelcome private intruder, or call the police if he persists in seeking entrance. The availability of such alternative means for the protection of privacy may lead the State to restrict imposition of liability for any consequent trespass. A private citizen, asserting no authority other than his own, will not normally be liable in trespass if he demands, and is granted, admission to another's house. See W. Prosser, The Law of Torts § 18, pp. 109-110 (3d ed. 1964); 1 F. Harper & F. James, The Law of Torts § 1.11 (1956). But one who demands admission under a claim of federal authority stands in a far different position. Cf. Amos v. United States, 255 U. S. 313, 317 (1921). The mere invocation of federal power by a federal law enforcement official will normally render futile any attempt to resist an unlawful entry or arrest by resort to the local police; and a claim of authority to enter is likely to unlock the door as well. See Weeks v. United States, 232 U. S. 383, 386 (1914); Amos v. United States, supra.[7] "In such cases there is no safety for the citizen, *395 except in the protection of the judicial tribunals, for rights which have been invaded by the officers of the government, professing to act in its name. There remains to him but the alternative of resistance, which may amount to crime." United States v. Lee, 106 U. S. 196, 219 (1882).[8] Nor is it adequate to answer that state law may take into account the different status of one clothed with the authority of the Federal Government. For just as state law may not authorize federal agents to violate the Fourth Amendment, Byars v. United States, supra; Weeks v. United States, supra; In re Ayers, 123 U. S. 443, 507 (1887), neither may state law undertake to limit the extent to which federal authority can be exercised. In re Neagle, 135 U. S. 1 (1890). The inevitable consequence of this dual limitation on state power is that the federal question becomes not merely a possible defense to the state law action, but an independent claim both necessary and sufficient to make out the plaintiff's cause of action. Cf. Boilermakers v. Hardeman, 401 U. S. 233, 241 (1971).
Third. That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition. Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. See Nixon v. Condon, 286 U. S. 73 (1932); *396 Nixon v. Herndon, 273 U. S. 536, 540 (1927); Swafford v. Templeton, 185 U. S. 487 (1902); Wiley v. Sinkler, 179 U. S. 58 (1900); J. Landynski, Search and Seizure and the Supreme Court 28 et seq. (1966); N. Lasson, History and Development of the Fourth Amendment to the United States Constitution 43 et seq. (1937); Katz, The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in Bell v. Hood, 117 U. Pa. L. Rev. 1, 8-33 (1968); cf. West v. Cabell, 153 U. S. 78 (1894); Lammon v. Feusier, 111 U. S. 17 (1884). Of course, the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation. But "it is . . . well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." Bell v. Hood, 327 U. S., at 684 (footnote omitted). The present case involves no special factors counselling hesitation in the absence of affirmative action by Congress. We are not dealing with a question of "federal fiscal policy," as in United States v. Standard Oil Co., 332 U. S. 301, 311 (1947). In that case we refused to infer from the Government-soldier relationship that the United States could recover damages from one who negligently injured a soldier and thereby caused the Government to pay his medical expenses and lose his services during the course of his hospitalization. Noting that Congress was normally quite solicitous where the federal purse was involved, we pointed out that "the United States [was] the party plaintiff to the suit. And the United States has power at any time to create the liability." Id., at 316; see United States v. Gilman, 347 U. S. 507 (1954). Nor are we asked in this case to impose liability upon a congressional employee for actions contrary to no constitutional *397 prohibition, but merely said to be in excess of the authority delegated to him by the Congress. Wheeldin v. Wheeler, 373 U. S. 647 (1963). Finally, we cannot accept respondents' formulation of the question as whether the availability of money damages is necessary to enforce the Fourth Amendment. For we have here no explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress. The question is merely whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts. Cf. J. I. Case Co. v. Borak, 377 U. S. 426, 433 (1964); Jacobs v. United States, 290 U. S. 13, 16 (1933). "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." Marbury v. Madison, 1 Cranch 137, 163 (1803). Having concluded that petitioner's complaint states a cause of action under the Fourth Amendment, supra, at 390-395, we hold that petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment.

II
In addition to holding that petitioner's complaint had failed to state facts making out a cause of action, the District Court ruled that in any event respondents were immune from liability by virtue of their official position. 276 F. Supp., at 15. This question was not passed upon by the Court of Appeals, and accordingly we do not consider *398 it here. The judgment of the Court of Appeals is reversed and the case is remanded for further proceedings consistent with this opinion.
So ordered.
MR. JUSTICE HARLAN, concurring in the judgment.
My initial view of this case was that the Court of Appeals was correct in dismissing the complaint, but for reasons stated in this opinion I am now persuaded to the contrary. Accordingly, I join in the judgment of reversal.
Petitioner alleged, in his suit in the District Court for the Eastern District of New York, that the defendants, federal agents acting under color of federal law, subjected him to a search and seizure contravening the requirements of the Fourth Amendment. He sought damages in the amount of $15,000 from each of the agents. Federal jurisdiction was claimed, inter alia,[1] under 28 U. S. C. § 1331 (a) which provides:
"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."
The District Court dismissed the complaint for lack of federal jurisdiction under 28 U. S. C. § 1331 (a) and failure to state a claim for which relief may be granted. 276 F. Supp 12 (EDNY 1967). On appeal, the Court of Appeals concluded, on the basis of this Court's decision in Bell v. Hood, 327 U. S. 678 (1946), that petitioner's claim for damages did "[arise] under the Constitution" *399 within the meaning of 28 U. S. C. § 1331 (a); but the District Court's judgment was affirmed on the ground that the complaint failed to state a claim for which relief can be granted. 409 F. 2d 718 (CA2 1969).
In so concluding, Chief Judge Lumbard's opinion reasoned, in essence, that: (1) the framers of the Fourth Amendment did not appear to contemplate a "wholly new federal cause of action founded directly on the Fourth Amendment," id., at 721, and (2) while the federal courts had power under a general grant of jurisdiction to imply a federal remedy for the enforcement of a constitutional right, they should do so only when the absence of alternative remedies renders the constitutional command a "mere `form of words.' " Id., at 723. The Government takes essentially the same position here. Brief for Respondents 4-5. And two members of the Court add the contention that we lack the constitutional power to accord Bivens a remedy for damages in the absence of congressional action creating "a federal cause of action for damages for an unreasonable search in violation of the Fourth Amendment." Opinion of MR. JUSTICE BLACK, post, at 427; see also opinion of THE CHIEF JUSTICE, post, at 418, 422.
For the reasons set forth below, I am of the opinion that federal courts do have the power to award damages for violation of "constitutionally protected interests" and I agree with the Court that a traditional judicial remedy such as damages is appropriate to the vindication of the personal interests protected by the Fourth Amendment.

I
I turn first to the contention that the constitutional power of federal courts to accord Bivens damages for his claim depends on the passage of a statute creating a "federal cause of action." Although the point is not *400 entirely free of ambiguity,[2] I do not understand either the Government or my dissenting Brothers to maintain that Bivens' contention that he is entitled to be free from the type of official conduct prohibited by the Fourth Amendment depends on a decision by the State in which he resides to accord him a remedy. Such a position would be incompatible with the presumed availability of federal equitable relief, if a proper showing can be made in terms of the ordinary principles governing equitable remedies. See Bell v. Hood, 327 U. S. 678, 684 (1946). However broad a federal court's discretion concerning equitable remedies, it is absolutely clearat least after Erie R. Co. v. Tompkins, 304 U. S. 64 (1938)that in a nondiversity suit a federal court's power to grant even equitable relief depends on the presence of a substantive right derived from federal law. Compare Guaranty Trust Co. v. York, 326 U. S. 99, 105-107 (1945), with Holmberg v. Armbrecht, 327 U. S. 392, 395 (1946). See also H. Hart & H. Wechsler, The Federal Courts and the Federal System 818-819 (1953).
Thus the interest which Bivens claimsto be free from official conduct in contravention of the Fourth Amendmentis a federally protected interest. See generally Katz, The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in Bell v. Hood, 117 U. Pa. L. Rev. 1, 33-34 (1968).[3] Therefore, the question *401 of judicial power to grant Bivens damages is not a problem of the "source" of the "right"; instead, the question is whether the power to authorize damages as a judicial *402 remedy for the vindication of a federal constitutional right is placed by the Constitution itself exclusively in Congress' hands.

II
The contention that the federal courts are powerless to accord a litigant damages for a claimed invasion of his federal constitutional rights until Congress explicitly authorizes the remedy cannot rest on the notion that the decision to grant compensatory relief involves a resolution of policy considerations not susceptible of judicial discernment. Thus, in suits for damages based on violations of federal statutes lacking any express authorization of a damage remedy, this Court has authorized such relief where, in its view, damages are necessary to effectuate the congressional policy underpinning the substantive provisions of the statute. J. I. Case Co. v. Borak, 377 U. S. 426 (1964); Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U. S. 210, 213 (1944). Cf. Wyandotte Transportation Co. v. United States, 389 U. S. 191, 201-204 (1967).[4]
*403 If it is not the nature of the remedy which is thought to render a judgment as to the appropriateness of damages inherently "legislative," then it must be the nature of the legal interest offered as an occasion for invoking otherwise appropriate judicial relief. But I do not think that the fact that the interest is protected by the Constitution rather than statute or common law justifies the assertion that federal courts are powerless to grant damages in the absence of explicit congressional action authorizing the remedy. Initially, I note that it would be at least anomalous to conclude that the federal judiciary while competent to choose among the range of traditional judicial remedies to implement statutory and common-law policies, and even to generate substantive rules governing primary behavior in furtherance of broadly formulated policies articulated by statute or Constitution, see Textile Workers v. Lincoln Mills, 353 U. S. 448 (1957); United States v. Standard Oil Co., 332 U. S. 301, 304-311 (1947); Clearfield Trust Co. v. United States, 318 U. S. 363 (1943)is powerless to accord a damages *404 remedy to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the Government as an instrument of the popular will.
More importantly, the presumed availability of federal equitable relief against threatened invasions of constitutional interests appears entirely to negate the contention that the status of an interest as constitutionally protected divests federal courts of the power to grant damages absent express congressional authorization. Congress provided specially for the exercise of equitable remedial powers by federal courts, see Act of May 8, 1792, § 2, 1 Stat. 276; C. Wright, Law of Federal Courts 257 (2d ed., 1970), in part because of the limited availability of equitable remedies in state courts in the early days of the Republic. See Guaranty Trust Co. v. York, 326 U. S. 99, 104-105 (1945). And this Court's decisions make clear that, at least absent congressional restrictions, the scope of equitable remedial discretion is to be determined according to the distinctive historical traditions of equity as an institution, Holmberg v. Armbrecht, 327 U. S. 392, 395-396 (1946); Sprague v. Ticonic National Bank, 307 U. S. 161, 165-166 (1939). The reach of a federal district court's "inherent equitable powers," Textile Workers v. Lincoln Mills, 353 U. S. 448, 460 (Burton, J., concurring in result), is broad indeed, e. g., Swann v. Charlotte-Mecklenburg Board of Education, 401 U. S. 1 (1971); nonetheless, the federal judiciary is not empowered to grant equitable relief in the absence of congressional action extending jurisdiction over the subject matter of the suit. See Textile Workers v. Lincoln Mills, supra, at 460 (Burton, J., concurring in result); Katz, 117 U. Pa. L. Rev., at 43.[5]
*405 If explicit congressional authorization is an absolute prerequisite to the power of a federal court to accord compensatory relief regardless of the necessity or appropriateness of damages as a remedy simply because of the status of a legal interest as constitutionally protected, then it seems to me that explicit congressional authorization is similarly prerequisite to the exercise of equitable remedial discretion in favor of constitutionally protected interests. Conversely, if a general grant of jurisdiction to the federal courts by Congress is thought adequate to empower a federal court to grant equitable relief for all areas of subject-matter jurisdiction enumerated therein, see 28 U. S. C. § 1331 (a), then it seems to me that the same statute is sufficient to empower a federal court to grant a traditional remedy at law.[6] Of course, the special historical traditions governing the federal equity system, see Sprague v. Ticonic National Bank, 307 U. S. 161 *406 (1939), might still bear on the comparative appropriateness of granting equitable relief as opposed to money damages. That possibility, however, relates, not to whether the federal courts have the power to afford one type of remedy as opposed to the other, but rather to the criteria which should govern the exercise of our power. To that question, I now pass.

III
The major thrust of the Government's position is that, where Congress has not expressly authorized a particular remedy, a federal court should exercise its power to accord a traditional form of judicial relief at the behest of a litigant, who claims a constitutionally protected interest has been invaded, only where the remedy is "essential," or "indispensable for vindicating constitutional rights." Brief for Respondents 19, 24. While this "essentiality" test is most clearly articulated with respect to damages remedies, apparently the Government believes the same test explains the exercise of equitable remedial powers. Id., at 17-18. It is argued that historically the Court has rarely exercised the power to accord such relief in the absence of an express congressional authorization and that "[i]f Congress had thought that federal officers should be subject to a law different than state law, it would have had no difficulty in saying so, as it did with respect to state officers . . . ." Id., at 20-21; see 42 U. S. C. § 1983. Although conceding that the standard of determining whether a damage remedy should be utilized to effectuate statutory policies is one of "necessity" or "appropriateness," see J. I. Case Co. v. Borak, 377 U. S. 426, 432 (1964); United States v. Standard Oil Co., 332 U. S. 301, 307 (1947), the Government contends that questions concerning congressional discretion to modify judicial remedies relating to constitutionally protected interests warrant a more stringent constraint on *407 the exercise of judicial power with respect to this class of legally protected interests. Brief for Respondents 21-22.
These arguments for a more stringent test to govern the grant of damages in constitutional cases[7] seem to be adequately answered by the point that the judiciary has a particular responsibility to assure the vindication of constitutional interests such as those embraced by the Fourth Amendment. To be sure, "it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." Missouri, Kansas & Texas R. Co. v. May, 194 U. S. 267, 270 (1904). But it must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities; at the very least, it strikes me as no more appropriate to await express congressional authorization of traditional judicial relief with regard to these legal interests than with respect to interests protected by federal statutes.
The question then, is, as I see it, whether compensatory relief is "necessary" or "appropriate" to the vindication of the interest asserted. Cf. J. I. Case Co. v. Borak, supra, at 432; United States v. Standard Oil Co., supra, at 307; Hill, Constitutional Remedies, 69 Col. L. Rev. 1109, 1155 (1969); Katz, 117 U. Pa. L. Rev., at 72. In resolving that question, it seems to me that the range of policy considerations we may take into account is at least as broad as the range of those a legislature would consider with respect to an express statutory authorization of a traditional remedy. In this regard I agree with the Court that the appropriateness of according Bivens *408 compensatory relief does not turn simply on the deterrent effect liability will have on federal official conduct.[8] Damages as a traditional form of compensation for invasion of a legally protected interest may be entirely appropriate even if no substantial deterrent effects on future official lawlessness might be thought to result. Bivens, after all, has invoked judicial processes claiming entitlement to compensation for injuries resulting from allegedly lawless official behavior, if those injuries are properly compensable in money damages. I do not think a court of lawvested with the power to accord a remedyshould deny him his relief simply because he cannot show that future lawless conduct will thereby be deterred.
And I think it is clear that Bivens advances a claim of the sort that, if proved, would be properly compensable in damages. The personal interests protected by the Fourth Amendment are those we attempt to capture by the notion of "privacy"; while the Court today properly points out that the type of harm which officials can inflict when they invade protected zones of an individual's life *409 are different from the types of harm private citizens inflict on one another, the experience of judges in dealing with private trespass and false imprisonment claims supports the conclusion that courts of law are capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of Fourth Amendment rights.[9]
On the other hand, the limitations on state remedies for violation of common-law rights by private citizens argue in favor of a federal damages remedy. The injuries inflicted by officials acting under color of law, while no less compensable in damages than those inflicted by private parties, are substantially different in kind, as the Court's opinion today discusses in detail. See Monroe v. Pape, 365 U. S. 167, 195 (1961) (HARLAN, J., concurring). It seems to me entirely proper that these injuries be compensable according to uniform rules of federal law, especially in light of the very large element of federal law which must in any event control the scope of official defenses to liability. See Wheeldin v. Wheeler, 373 U. S. 647, 652 (1963); Monroe v. Pape, supra, at 194-195 (HARLAN, J., concurring); Howard v. Lyons, 360 U. S. 593 (1959). Certainly, there is very little to be gained from the standpoint of federalism by preserving different rules of liability for federal officers dependent on the State where the injury occurs. Cf. United States v. Standard Oil Co., 332 U. S. 301, 305-311 (1947).
Putting aside the desirability of leaving the problem of federal official liability to the vagaries of common-law actions, it is apparent that some form of damages is the only possible remedy for someone in Bivens' alleged *410 position. It will be a rare case indeed in which an individual in Bivens' position will be able to obviate the harm by securing injunctive relief from any court. However desirable a direct remedy against the Government might be as a substitute for individual official liability, the sovereign still remains immune to suit. Finally, assuming Bivens' innocence of the crime charged, the "exclusionary rule" is simply irrelevant. For people in Bivens' shoes, it is damages or nothing.
The only substantial policy consideration advanced against recognition of a federal cause of action for violation of Fourth Amendment rights by federal officials is the incremental expenditure of judicial resources that will be necessitated by this class of litigation. There is, however, something ultimately self-defeating about this argument. For if, as the Government contends, damages will rarely be realized by plaintiffs in these cases because of jury hostility, the limited resources of the official concerned, etc., then I am not ready to assume that there will be a significant increase in the expenditure of judicial resources on these claims. Few responsible lawyers and plaintiffs are likely to choose the course of litigation if the statistical chances of success are truly de minimis. And I simply cannot agree with my Brother BLACK that the possibility of "frivolous" claimsif defined simply as claims with no legal meritwarrants closing the courthouse doors to people in Bivens' situation. There are other ways, short of that, of coping with frivolous lawsuits.
On the other hand, ifas I believe is the case with respect, at least, to the most flagrant abuses of official powerdamages to some degree will be available when the option of litigation is chosen, then the question appears to be how Fourth Amendment interests rank on a scale of social values compared with, for example, the interests of stockholders defrauded by misleading proxies. *411 See J. I. Case Co. v. Borak, supra. Judicial resources, I am well aware, are increasingly scarce these days. Nonetheless, when we automatically close the courthouse door solely on this basis, we implicitly express a value judgment on the comparative importance of classes of legally protected interests. And current limitations upon the effective functioning of the courts arising from budgetary inadequacies should not be permitted to stand in the way of the recognition of otherwise sound constitutional principles.
Of course, for a variety of reasons, the remedy may not often be sought. See generally Foote, Tort Remedies for Police Violations of Individual Rights, 39 Minn. L. Rev. 493 (1955). And the countervailing interests in efficient law enforcement of course argue for a protective zone with respect to many types of Fourth Amendment violations. Cf. Barr v. Matteo, 360 U. S. 564 (1959) (opinion of HARLAN, J.). But, while I express no view on the immunity defense offered in the instant case, I deem it proper to venture the thought that at the very least such a remedy would be available for the most flagrant and patently unjustified sorts of police conduct. Although litigants may not often choose to seek relief, it is important, in a civilized society, that the judicial branch of the Nation's government stand ready to afford a remedy in these circumstances. It goes without saying that I intimate no view on the merits of petitioner's underlying claim.
For these reasons, I concur in the judgment of the Court.
MR. CHIEF JUSTICE BURGER, dissenting.
I dissent from today's holding which judicially creates a damage remedy not provided for by the Constitution and not enacted by Congress. We would more surely preserve the important values of the doctrine of separation *412 of powersand perhaps get a better resultby recommending a solution to the Congress as the branch of government in which the Constitution has vested the legislative power. Legislation is the business of the Congress, and it has the facilities and competence for that taskas we do not. Professor Thayer, speaking of the limits on judicial power, albeit in another context, had this to say:[1]
"And if it be true that the holders of legislative power are careless or evil, yet the constitutional duty of the court remains untouched; it cannot rightly attempt to protect the people, by undertaking a function not its own. On the other hand, by adhering rigidly to its own duty, the court will help, as nothing else can, to fix the spot where responsibility lies, and to bring down on that precise locality the thunderbolt of popular condemnation. . . . For that coursethe true course of judicial duty always will powerfully help to bring the people and their representatives to a sense of their own responsibility."
This case has significance far beyond its facts and its holding. For more than 55 years this Court has enforced a rule under which evidence of undoubted reliability and probative value has been suppressed and excluded from criminal cases whenever it was obtained in violation of the Fourth Amendment. Weeks v. United States, 232 U. S. 383 (1914); Boyd v. United States, 116 U. S. 616, 633 (1886) (dictum). This rule was extended to the States in Mapp v. Ohio, 367 U. S. 643 (1961).[2] *413 The rule has rested on a theory that suppression of evidence in these circumstances was imperative to deter law enforcement authorities from using improper methods to obtain evidence.
The deterrence theory underlying the suppression doctrine, or exclusionary rule, has a certain appeal in spite of the high price society pays for such a drastic remedy. Notwithstanding its plausibility, many judges and lawyers and some of our most distinguished legal scholars have never quite been able to escape the force of Cardozo's statement of the doctrine's anomalous result:
"The criminal is to go free because the constable has blundered. . . . A room is searched against the law, and the body of a murdered man is found. . . . The privacy of the home has been infringed, and the murderer goes free." People v. Defore, 242 N. Y. 13, 21, 23-24, 150 N. E. 585, 587, 588 (1926).[3]
The plurality opinion in Irvine v. California, 347 U. S. 128, 136 (1954), catalogued the doctrine's defects:
"Rejection of the evidence does nothing to punish the wrong-doing official, while it may, and likely will, release the wrong-doing defendant. It deprives society of its remedy against one lawbreaker because he has been pursued by another. It protects one against whom incriminating evidence is discovered, but does nothing to protect innocent persons who are the victims of illegal but fruitless searches."
From time to time members of the Court, recognizing the validity of these protests, have articulated varying *414 alternative justifications for the suppression of important evidence in a criminal trial. Under one of these alternative theories the rule's foundation is shifted to the "sporting contest" thesis that the government must "play the game fairly" and cannot be allowed to profit from its own illegal acts. Olmstead v. United States, 277 U. S. 438, 469, 471 (1928) (dissenting opinions); see Terry v. Ohio, 392 U. S. 1, 13 (1968). But the exclusionary rule does not ineluctably flow from a desire to ensure that government plays the "game" according to the rules. If an effective alternative remedy is available, concern for official observance of the law does not require adherence to the exclusionary rule. Nor is it easy to understand how a court can be thought to endorse a violation of the Fourth Amendment by allowing illegally seized evidence to be introduced against a defendant if an effective remedy is provided against the government.
The exclusionary rule has also been justified on the theory that the relationship between the Self-Incrimination Clause of the Fifth Amendment and the Fourth Amendment requires the suppression of evidence seized in violation of the latter. Boyd v. United States, supra, at 633 (dictum); Wolf v. Colorado, 338 U. S. 25, 47, 48 (1949) (Rutledge, J., dissenting); Mapp v. Ohio, supra, at 661-666 (BLACK, J., concurring).
Even ignoring, however, the decisions of this Court that have held that the Fifth Amendment applies only to "testimonial" disclosures, United States v. Wade, 388 U. S. 218, 221-223 (1967); Schmerber v. California, 384 U. S. 757, 764 and n. 8 (1966), it seems clear that the Self-Incrimination Clause does not protect a person from the seizure of evidence that is incriminating. It protects a person only from being the conduit by which the police acquire evidence. Mr. Justice Holmes once put it succinctly, "A party is privileged from producing the *415 evidence but not from its production." Johnson v. United States, 228 U. S. 457, 458 (1913).
It is clear, however, that neither of these theories undergirds the decided cases in this Court. Rather the exclusionary rule has rested on the deterrent rationalethe hope that law enforcement officials would be deterred from unlawful searches and seizures if the illegally seized, albeit trustworthy, evidence was suppressed often enough and the courts persistently enough deprived them of any benefits they might have gained from their illegal conduct.
This evidentiary rule is unique to American jurisprudence. Although the English and Canadian legal systems are highly regarded, neither has adopted our rule. See Martin, The Exclusionary Rule Under Foreign Law Canada, 52 J. Crim. L. C. & P. S. 271, 272 (1961); Williams, The Exclusionary Rule Under Foreign Law England, 52 J. Crim. L. C. & P. S. 272 (1961).
I do not question the need for some remedy to give meaning and teeth to the constitutional guarantees against unlawful conduct by government officials. Without some effective sanction, these protections would constitute little more than rhetoric. Beyond doubt the conduct of some officials requires sanctions as cases like Irvine indicate. But the hope that this objective could be accomplished by the exclusion of reliable evidence from criminal trials was hardly more than a wistful dream. Although I would hesitate to abandon it until some meaningful substitute is developed, the history of the suppression doctrine demonstrates that it is both conceptually sterile and practically ineffective in accomplishing its stated objective. This is illustrated by the paradox that an unlawful act against a totally innocent personsuch as petitioner claims to behas been left without an effective remedy, and hence the Court finds *416 it necessary now55 years laterto construct a remedy of its own.
Some clear demonstration of the benefits and effectiveness of the exclusionary rule is required to justify it in view of the high price it extracts from societythe release of countless guilty criminals. See Allen, Federalism and the Fourth Amendment: A Requiem for Wolf, 1961 Sup. Ct. Rev. 1, 33 n. 172. But there is no empirical evidence to support the claim that the rule actually deters illegal conduct of law enforcement officials. Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 667 (1970).
There are several reasons for this failure. The rule does not apply any direct sanction to the individual official whose illegal conduct results in the exclusion of evidence in a criminal trial. With rare exceptions law enforcement agencies do not impose direct sanctions on the individual officer responsible for a particular judicial application of the suppression doctrine. Id., at 710. Thus there is virtually nothing done to bring about a change in his practices. The immediate sanction triggered by the application of the rule is visited upon the prosecutor whose case against a criminal is either weakened or destroyed. The doctrine deprives the police in no real sense; except that apprehending wrongdoers is their business, police have no more stake in successful prosecutions than prosecutors or the public.
The suppression doctrine vaguely assumes that law enforcement is a monolithic governmental enterprise. For example, the dissenters in Wolf v. Colorado, supra, at 44, argued that:
"Only by exclusion can we impress upon the zealous prosecutor that violation of the Constitution will do him no good. And only when that point is driven home can the prosecutor be expected to emphasize *417 the importance of observing the constitutional demands in his instructions to the police." (Emphasis added.)
But the prosecutor who loses his case because of police misconduct is not an official in the police department; he can rarely set in motion any corrective action or administrative penalties. Moreover, he does not have control or direction over police procedures or police actions that lead to the exclusion of evidence. It is the rare exception when a prosecutor takes part in arrests, searches, or seizures so that he can guide police action.
Whatever educational effect the rule conceivably might have in theory is greatly diminished in fact by the realities of law enforcement work. Policemen do not have the time, inclination, or training to read and grasp the nuances of the appellate opinions that ultimately define the standards of conduct they are to follow. The issues that these decisions resolve often admit of neither easy nor obvious answers, as sharply divided courts on what is or is not "reasonable" amply demonstrate.[4] Nor can judges, in all candor, forget that opinions sometimes lack helpful clarity.
The presumed educational effect of judicial opinions is also reduced by the long time lapseoften several years between the original police action and its final judicial evaluation. Given a policeman's pressing responsibilities, it would be surprising if he ever becomes aware of the final result after such a delay. Finally, the exclusionary *418 rule's deterrent impact is diluted by the fact that there are large areas of police activity that do not result in criminal prosecutionshence the rule has virtually no applicability and no effect in such situations. Oaks, supra, at 720-724.
Today's holding seeks to fill one of the gaps of the suppression doctrineat the price of impinging on the legislative and policy functions that the Constitution vests in Congress. Nevertheless, the holding serves the useful purpose of exposing the fundamental weaknesses of the suppression doctrine. Suppressing unchallenged truth has set guilty criminals free but demonstrably has neither deterred deliberate violations of the Fourth Amendment nor decreased those errors in judgment that will inevitably occur given the pressures inherent in police work having to do with serious crimes.
Although unfortunately ineffective, the exclusionary rule has increasingly been characterized by a single, monolithic, and drastic judicial response to all official violations of legal norms. Inadvertent errors of judgment that do not work any grave injustice will inevitably occur under the pressure of police work. These honest mistakes have been treated in the same way as deliberate and flagrant Irvine-type violations of the Fourth Amendment. For example, in Miller v. United States, 357 U. S. 301, 309-310 (1958), reliable evidence was suppressed because of a police officer's failure to say a "few more words" during the arrest and search of a known narcotics peddler.
This Court's decision announced today in Coolidge v. New Hampshire, post, p. 443, dramatically illustrates the extent to which the doctrine represents a mechanically inflexible response to widely varying degrees of police error and the resulting high price that society pays. I dissented in Coolidge primarily because I do not believe the Fourth Amendment had been violated. Even on the Court's contrary premise, however, whatever violation *419 occurred was surely insufficient in nature and extent to justify the drastic result dictated by the suppression doctrine. A fair trial by jury has resolved doubts as to Coolidge's guilt. But now his conviction on retrial is placed in serious question by the remand for a new trialyears after the crimein which evidence that the New Hampshire courts found relevant and reliable will be withheld from the jury's consideration. It is hardly surprising that such results are viewed with incomprehension by nonlawyers in this country and lawyers, judges, and legal scholars the world over.
Freeing either a tiger or a mouse in a schoolroom is an illegal act, but no rational person would suggest that these two acts should be punished in the same way. From time to time judges have occasion to pass on regulations governing police procedures. I wonder what would be the judicial response to a police order authorizing "shoot to kill" with respect to every fugitive. It is easy to predict our collective wrath and outrage. We, in common with all rational minds, would say that the police response must relate to the gravity and need; that a "shoot" order might conceivably be tolerable to prevent the escape of a convicted killer but surely not for a car thief, a pickpocket or a shoplifter.
I submit that society has at least as much right to expect rationally graded responses from judges in place of the universal "capital punishment" we inflict on all evidence when police error is shown in its acquisition. See ALI, Model Code of Pre-Arraignment Procedure § SS 8.02 (2), p. 23 (Tent. Draft No. 4, 1971), reprinted in the Appendix to this opinion. Yet for over 55 years, and with increasing scope and intensity as today's Coolidge holding shows, our legal system has treated vastly dissimilar cases as if they were the same. Our adherence to the exclusionary rule, our resistance to change, and our refusal even to acknowledge the need *420 for effective enforcement mechanisms bring to mind Holmes' well-known statement:
"It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897).
In characterizing the suppression doctrine as an anomalous and ineffective mechanism with which to regulate law enforcement, I intend no reflection on the motivation of those members of this Court who hoped it would be a means of enforcing the Fourth Amendment. Judges cannot be faulted for being offended by arrests, searches, and seizures that violate the Bill of Rights or statutes intended to regulate public officials. But we can and should be faulted for clinging to an unworkable and irrational concept of law. My criticism is that we have taken so long to find better ways to accomplish these desired objectives. And there are better ways.
Instead of continuing to enforce the suppression doctrine inflexibly, rigidly, and mechanically, we should view it as one of the experimental steps in the great tradition of the common law and acknowledge its shortcomings. But in the same spirit we should be prepared to discontinue what the experience of over half a century has shown neither deters errant officers nor affords a remedy to the totally innocent victims of official misconduct.
I do not propose, however, that we abandon the suppression doctrine until some meaningful alternative can be developed. In a sense our legal system has become the captive of its own creation. To overrule Weeks and Mapp, even assuming the Court was now prepared to *421 take that step, could raise yet new problems. Obviously the public interest would be poorly served if law enforcement officials were suddenly to gain the impression, however erroneous, that all constitutional restraints on police had somehow been removedthat an open season on "criminals" had been declared. I am concerned lest some such mistaken impression might be fostered by a flat overruling of the suppression doctrine cases. For years we have relied upon it as the exclusive remedy for unlawful official conduct; in a sense we are in a situation akin to the narcotics addict whose dependence on drugs precludes any drastic or immediate withdrawal of the supposed prop, regardless of how futile its continued use may be.
Reasonable and effective substitutes can be formulated if Congress would take the lead, as it did for example in 1946 in the Federal Tort Claims Act. I see no insuperable obstacle to the elimination of the suppression doctrine if Congress would provide some meaningful and effective remedy against unlawful conduct by government officials.
The problems of both error and deliberate misconduct by law enforcement officials call for a workable remedy. Private damage actions against individual police officers concededly have not adequately met this requirement, and it would be fallacious to assume today's work of the Court in creating a remedy will really accomplish its stated objective. There is some validity to the claims that juries will not return verdicts against individual officers except in those unusual cases where the violation has been flagrant or where the error has been complete, as in the arrest of the wrong person or the search of the wrong house. There is surely serious doubt, for example, that a drug peddler caught packaging his wares will be able to arouse much sympathy in a jury on the ground that the police officer did not announce his identity and *422 purpose fully or because he failed to utter a "few more words." See Miller v. United States, supra. Jurors may well refuse to penalize a police officer at the behest of a person they believe to be a "criminal" and probably will not punish an officer for honest errors of judgment. In any event an actual recovery depends on finding nonexempt assets of the police officer from which a judgment can be satisfied.
I conclude, therefore, that an entirely different remedy is necessary but it is one that in my view is as much beyond judicial power as the step the Court takes today. Congress should develop an administrative or quasijudicial remedy against the government itself to afford compensation and restitution for persons whose Fourth Amendment rights have been violated. The venerable doctrine of respondeat superior in our tort law provides an entirely appropriate conceptual basis for this remedy. If, for example, a security guard privately employed by a department store commits an assault or other tort on a customer such as an improper search, the victim has a simple and obvious remedyan action for money damages against the guard's employer, the department store. W. Prosser, The Law of Torts § 68, pp. 470-480 (3d ed. 1964).[5] Such a statutory scheme would have the added advantage of providing some remedy to the completely innocent persons who are sometimes the victims of illegal police conductsomething that the suppression doctrine, of course, can never accomplish.
A simple structure would suffice.[6] For example, Congress could enact a statute along the following lines:
(a) a waiver of sovereign immunity as to the illegal *423 acts of law enforcement officials committed in the performance of assigned duties;
(b) the creation of a cause of action for damages sustained by any person aggrieved by conduct of governmental agents in violation of the Fourth Amendment or statutes regulating official conduct;
(c) the creation of a tribunal, quasi-judicial in nature or perhaps patterned after the United States Court of Claims, to adjudicate all claims under the statute;
(d) a provision that this statutory remedy is in lieu of the exclusion of evidence secured for use in criminal cases in violation of the Fourth Amendment; and
(e) a provision directing that no evidence, otherwise admissible, shall be excluded from any criminal proceeding because of violation of the Fourth Amendment.
I doubt that lawyers serving on such a tribunal would be swayed either by undue sympathy for officers or by the prejudice against "criminals" that has sometimes moved lay jurors to deny claims. In addition to awarding damages, the record of the police conduct that is condemned would undoubtedly become a relevant part of an officer's personnel file so that the need for additional training or disciplinary action could be identified or his future usefulness as a public official evaluated. Finally, appellate judicial review could be made available on much the same basis that it is now provided as to district courts and regulatory agencies. This would leave to the courts the ultimate responsibility for determining and articulating standards.
Once the constitutional validity of such a statute is established,[7] it can reasonably be assumed that the States *424 would develop their own remedial systems on the federal model. Indeed there is nothing to prevent a State from enacting a comparable statutory scheme without waiting for the Congress. Steps along these lines would move our system toward more responsible law enforcement on the one hand and away from the irrational and drastic results of the suppression doctrine on the other. Independent of the alternative embraced in this dissenting opinion, I believe the time has come to re-examine the scope of the exclusionary rule and consider at least some narrowing of its thrust so as to eliminate the anomalies it has produced.
In a country that prides itself on innovation, inventive genius, and willingness to experiment, it is a paradox that we should cling for more than a half century to a legal mechanism that was poorly designed and never really worked. I can only hope now that the Congress will manifest a willingness to view realistically the hard evidence of the half-century history of the suppression doctrine revealing thousands of cases in which the criminal was set free because the constable blundered and virtually no evidence that innocent victims of police error such as petitioner claims to behave been afforded meaningful redress.

APPENDIX TO OPINION OF BURGER, C. J., DISSENTING
It is interesting to note that studies over a period of years led the American Law Institute to propose the following in its tentative draft of a model pre-arraignment code:
"(2) Determination. Unless otherwise required by the Constitution of the United States or of this State, a motion to suppress evidence based upon a *425 violation of any of the provisions of this code shall be granted only if the court finds that such violation was substantial. In determining whether a violation is substantial the court shall consider all the circumstances, including:
"(a) the importance of the particular interest violated;
"(b) the extent of deviation from lawful conduct;
"(c) the extent to which the violation was willful;
"(d) the extent to which privacy was invaded;
"(e) the extent to which exclusion will tend to prevent violations of this Code;
"(f) whether, but for the violation, the things seized would have been discovered; and
"(g) the extent to which the violation prejudiced the moving party's ability to support his motion, or to defend himself in the proceeding in which the things seized are sought to be offered in evidence against him.
"(3) Fruits of Prior Unlawful Search. If a search or seizure is carried out in such a manner that things seized in the course of the search would be subject to a motion to suppress under subsection (1), and if as a result of such search or seizure other evidence is discovered subsequently and offered against a defendant, such evidence shall be subject to a motion to suppress unless the prosecution establishes that such evidence would probably have been discovered by law enforcement authorities irrespective of such search or seizure, and the court finds that exclusion of such evidence is not necessary to deter violations of this Code."
ALI, Model Code of Pre-Arraignment Procedure §§ SS 8.02 (2), (3), pp. 23-24 (Tent. Draft No. 4, 1971) (emphasis supplied).
*426 The Reporters' views on the exclusionary rule are also reflected in their comment on the proposed section:
"The Reporters wish to emphasize that they are not, as a matter of policy, wedded to the exclusionary rule as the sole or best means of enforcing the Fourth Amendment. See Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. of Chi. L. Rev. 665 (1970). Paragraph (2) embodies what the Reporters hope is a more flexible approach to the problem, subject of course to constitutional requirements." Id., comment, at 26-27.
This is but one of many expressions of disenchantment with the exclusionary rule; see also:
1. Barrett, Exclusion of Evidence Obtained by Illegal SearchesA Comment on People vs. Cahan, 43 Calif. L. Rev. 565 (1955).
2. Burns, Mapp v. Ohio: An All-American Mistake, 19 DePaul L. Rev. 80 (1969).
3. Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif. L. Rev. 929, 951-954 (1965).
4. F. Inbau, J. Thompson, & C. Sowle, Cases and Comments on Criminal Justice: Criminal Law Administration 1-84 (3d ed. 1968).
5. LaFave, Improving Police Performance Through the Exclusionary Rule (pts. 1 & 2), 30 Mo. L. Rev. 391, 566 (1965).
6. LaFave & Remington, Controlling the Police: The Judge's Role in Making and Reviewing Law Enforcement Decisions, 63 Mich. L. Rev. 987 (1965).
7. N. Morris & G. Hawkins, The Honest Politician's Guide to Crime Control 101 (1970).
8. Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665 (1970).
*427 9. Plumb, Illegal Enforcement of the Law, 24 Cornell L. Q. 337 (1939).
10. Schaefer, The Fourteenth Amendment and Sanctity of the Person, 64 Nw. U. L. Rev. 1 (1969).
11. Waite, Judges and the Crime Burden, 54 Mich. L. Rev. 169 (1955).
12. Waite, EvidencePolice Regulation by Rules of Evidence, 42 Mich. L. Rev. 679 (1944).
13. Wigmore, Using Evidence Obtained by Illegal Search and Seizure, 8 A. B. A. J. 479 (1922).
14. 8 J. Wigmore, Evidence § 2184a (McNaughton rev. 1961).
MR. JUSTICE BLACK, dissenting.
In my opinion for the Court in Bell v. Hood, 327 U. S. 678 (1946), we did as the Court states, reserve the question whether an unreasonable search made by a federal officer in violation of the Fourth Amendment gives the subject of the search a federal cause of action for damages against the officers making the search. There can be no doubt that Congress could create a federal cause of action for damages for an unreasonable search in violation of the Fourth Amendment. Although Congress has created such a federal cause of action against state officials acting under color of state law,[*] it has never created such a cause of action against federal officials. If it wanted to do so, Congress could, of course, create a remedy against *428 federal officials who violate the Fourth Amendment in the performance of their duties. But the point of this case and the fatal weakness in the Court's judgment is that neither Congress nor the State of New York has enacted legislation creating such a right of action. For us to do so is, in my judgment, an exercise of power that the Constitution does not give us.
Even if we had the legislative power to create a remedy, there are many reasons why we should decline to create a cause of action where none has existed since the formation of our Government. The courts of the United States as well as those of the States are choked with lawsuits. The number of cases on the docket of this Court have reached an unprecedented volume in recent years. A majority of these cases are brought by citizens with substantial complaintspersons who are physically or economically injured by torts or frauds or governmental infringement of their rights; persons who have been unjustly deprived of their liberty or their property; and persons who have not yet received the equal opportunity in education, employment, and pursuit of happiness that was the dream of our forefathers. Unfortunately, there have also been a growing number of frivolous lawsuits, particularly actions for damages against law enforcement officers whose conduct has been judicially sanctioned by state trial and appellate courts and in many instances even by this Court. My fellow Justices on this Court and our brethren throughout the federal judiciary know only too well the time-consuming task of conscientiously poring over hundreds of thousands of pages of factual allegations of misconduct by police, judicial, and corrections officials. Of course, there are instances of legitimate grievances, but legislators might well desire to devote judicial resources to other problems of a more serious nature.
*429 We sit at the top of a judicial system accused by some of nearing the point of collapse. Many criminal defendants do not receive speedy trials and neither society nor the accused are assured of justice when inordinate delays occur. Citizens must wait years to litigate their private civil suits. Substantial changes in correctional and parole systems demand the attention of the lawmakers and the judiciary. If I were a legislator I might well find these and other needs so pressing as to make me believe that the resources of lawyers and judges should be devoted to them rather than to civil damage actions against officers who generally strive to perform within constitutional bounds. There is also a real danger that such suits might deter officials from the proper and honest performance of their duties.
All of these considerations make imperative careful study and weighing of the arguments both for and against the creation of such a remedy under the Fourth Amendment. I would have great difficulty for myself in resolving the competing policies, goals, and priorities in the use of resources, if I thought it were my job to resolve those questions. But that is not my task. The task of evaluating the pros and cons of creating judicial remedies for particular wrongs is a matter for Congress and the legislatures of the States. Congress has not provided that any federal court can entertain a suit against a federal officer for violations of Fourth Amendment rights occurring in the performance of his duties. A strong inference can be drawn from creation of such actions against state officials that Congress does not desire to permit such suits against federal officials. Should the time come when Congress desires such lawsuits, it has before it a model of valid legislation, 42 U. S. C. § 1983, to create a damage remedy against federal officers. Cases could be cited to support the legal proposition which *430 I assert, but it seems to me to be a matter of common understanding that the business of the judiciary is to interpret the laws and not to make them.
I dissent.
MR. JUSTICE BLACKMUN, dissenting.
I, too, dissent. I do so largely for the reasons expressed in Chief Judge Lumbard's thoughtful and scholarly opinion for the Court of Appeals. But I also feel that the judicial legislation, which the Court by its opinion today concededly is effectuating, opens the door for another avalanche of new federal cases. Whenever a suspect imagines, or chooses to assert, that a Fourth Amendment right has been violated, he will now immediately sue the federal officer in federal court. This will tend to stultify proper law enforcement and to make the day's labor for the honest and conscientious officer even more onerous and more critical. Why the Court moves in this direction at this time of our history, I do not know. The Fourth Amendment was adopted in 1791, and in all the intervening years neither the Congress nor the Court has seen fit to take this step. I had thought that for the truly aggrieved person other quite adequate remedies have always been available. If not, it is the Congress and not this Court that should act.
NOTES
[1] Petitioner's complaint does not explicitly state that the agents had no probable cause for his arrest, but it does allege that the arrest was "done unlawfully, unreasonably and contrary to law." App. 2. Petitioner's affidavit in support of his motion for summary judgment swears that the search was "without cause, consent or warrant," and that the arrest was "without cause, reason or warrant." App. 28.
[2] The agents were not named in petitioner's complaint, and the District Court ordered that the complaint be served upon "those federal agents who it is indicated by the records of the United States Attorney participated in the November 25, 1965, arrest of the [petitioner]." App. 3. Five agents were ultimately served.
[3] Judge Waterman, concurring, expressed the thought that "the federal courts can . . . entertain this cause of action irrespective of whether a statute exists specifically authorizing a federal suit against federal officers for damages" for acts such as those alleged. In his view, however, the critical point was recognition that some cause of action existed, albeit a state-created one, and in consequence he was willing "as of now" to concur in the holding of the Court of Appeals. 409 F. 2d, at 726 (emphasis in original).
[4] "[S]ince it is the present policy of the Department of Justice to remove to the federal courts all suits in state courts against federal officers for trespass or false imprisonment, a claim for relief, whether based on state common law or directly on the Fourth Amendment, will ultimately be heard in a federal court." Brief for Respondents 13 (citations omitted); see 28 U. S. C. § 1442 (a); Willingham v. Morgan, 395 U. S. 402 (1969). In light of this, it is difficult to understand our Brother BLACKMUN'S complaint that our holding today "opens the door for another avalanche of new federal cases." Post, at 430. In estimating the magnitude of any such "avalanche," it is worth noting that a survey of comparable actions against state officers under 42 U. S. C. § 1983 found only 53 reported cases in 17 years (1951-1967) that survived a motion to dismiss. Ginger & Bell, Police Misconduct LitigationPlaintiff's Remedies, 15 Am. Jur. Trials 555, 580-590 (1968). Increasing this figure by 900% to allow for increases in rate and unreported cases, every federal district judge could expect to try one such case every 13 years.
[5] New York at that time followed the common-law rule that a private person may arrest another if the latter has in fact committed a felony, and that if such is the case the presence or absence of probable cause is irrelevant to the legality of the arrest. See McLoughlin v. New York Edison Co., 252 N. Y. 202, 169 N. E. 277 (1929): cf. N. Y. Code Crim. Proc. § 183 (1958) for codification of the rule. Conspiracy to commit a federal crime was at the time a felony. Act of March 4, 1909, § 37, 35 Stat. 1096.
[6] Conversely, we have in some instances rejected Fourth Amendment claims despite facts demonstrating that federal agents were acting in violation of local law. McGuire v. United States, 273 U. S. 95 (1927) (trespass ab initio); Hester v. United States, 265 U. S. 57 (1924) ("open fields" doctrine); cf. Burdeau v. McDowell, 256 U. S. 465 (1921) (possession of stolen property).
[7] Similarly, although the Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant, Marron v. United States, 275 U. S. 192, 196 (1927); see Stanley v. Georgia, 394 U. S. 557, 570-572 (1969) (STEWART, J., concurring in result), a private individual lawfully in the home of another will not normally be liable for trespass beyond the bounds of his invitation absent clear notice to that effect. See 1 F. Harper & F. James, The Law of Torts § 1.11 (1956).
[8] Although no State has undertaken to limit the common-law doctrine that one may use reasonable force to resist an unlawful arrest by a private person, at least two States have outlawed resistance to an unlawful arrest sought to be made by a person known to be an officer of the law. R. I. Gen. Laws § 12-7-10 (1969); State v. Koonce, 89 N. J. Super. 169, 180-184, 214 A. 2d 428, 433-436 (1965).
[1] Petitioner also asserted federal jurisdiction under 42 U. S. C. § 1983 and 28 U. S. C. § 1343 (3), and 28 U. S. C. § 1343 (4). Neither will support federal jurisdiction over the claim. See Bivens v. Six Unknown Named Agents, 409 F. 2d 718, 720 n. 1 (CA2 1969).
[2] See n. 3, infra.
[3] The Government appears not quite ready to concede this point. Certain points in the Government's argument seem to suggest that the "state-created rightfederal defense" model reaches not only the question of the power to accord a federal damages remedy, but also the claim to any judicial remedy in any court. Thus, we are pointed to Lasson's observation concerning Madison's version of the Fourth Amendment as introduced into the House:

"The observation may be made that the language of the proposal did not purport to create the right to be secure from unreasonable search and seizures but merely stated it as a right which already existed."
N. Lasson, History and Development of the Fourth Amendment to the United States Constitution 100 n. 77 (1937), quoted in Brief for Respondents 11 n. 7. And, on the problem of federal equitable vindication of constitutional rights without regard to the presence of a "state-created right," see Hart, The Relations Between State and Federal Law, 54 Col. L. Rev. 489, 523-524 (1954), quoted in Brief for Respondents 17.
On this point, the choice of phraseology in the Fourth Amendment itself is singularly unpersuasive. The leading argument against a "Bill of Rights" was the fear that individual liberties not specified expressly would be taken as excluded. See generally, Lasson, supra, at 79-105. This circumstance alone might well explain why the authors of the Bill of Rights would opt for language which presumes the existence of a fundamental interest in liberty, albeit originally derived from the common law. See Entick v. Carrington, 19 How. St. Tr. 1029, 95 Eng. Rep. 807 (1765).
In truth, the legislative record as a whole behind the Bill of Rights is silent on the rather refined doctrinal question whether the framers considered the rights therein enumerated as dependent in the first instance on the decision of a State to accord legal status to the personal interests at stake. That is understandable since the Government itself points out that general federal-question jurisdiction was not extended to the federal district courts until 1875. Act of March 3, 1875, § 1, 18 Stat. 470. The most that can be drawn from this historical fact is that the authors of the Bill of Rights assumed the adequacy of common-law remedies to vindicate the federally protected interest. One must first combine this assumption with contemporary modes of jurisprudential thought which appeared to link "rights" and "remedies" in a 1:1 correlation, cf. Marbury v. Madison, 1 Cranch 137, 163 (1803), before reaching the conclusion that the framers are to be understood today as having created no federally protected interests. And, of course, that would simply require the conclusion that federal equitable relief would not lie to protect those interests guarded by the Fourth Amendment.
Professor Hart's observations concerning the "imperceptible steps" between In re Ayers, 123 U. S. 443 (1887), and Ex parte Young, 209 U. S. 123 (1908), see Hart, supra, fail to persuade me that the source of the legal interest asserted here is other than the Federal Constitution itself. In re Ayers concerned the precise question whether the Eleventh Amendment barred suit in a federal court for an injunction compelling a state officer to perform a contract to which the State was a party. Having concluded that the suit was inescapably a suit against the State under the Eleventh Amendment, the Court spoke of the presence of state-created rights as a distinguishing factor supporting the exercise of federal jurisdiction in other contract clause cases. The absence of a state-created right in In re Ayers served to distinguish that case from the perspective of the State's immunity to suit; Ayers simply does not speak to the analytically distinct question whether the Constitution is in the relevant sense a source of legal protection for the "rights" enumerated therein.
[4] The Borak case is an especially clear example of the exercise of federal judicial power to accord damages as an appropriate remedy in the absence of any express statutory authorization of a federal cause of action. There we "implied"from what can only be characterized as an "exclusively procedural provision" affording access to a federal forum, cf. Textile Workers v. Lincoln Mills, 353 U. S. 448, 462-463 (1957) (Frankfurter, J., dissenting)a private cause of action for damages for violation of § 14 (a) of the Securities Exchange Act of 1934, 48 Stat. 895, 15 U. S. C. § 78n (a). See § 27, 48 Stat. 902, 15 U. S. C. § 78aa. We did so in an area where federal regulation has been singularly comprehensive and elaborate administrative enforcement machinery had been provided. The exercise of judicial power involved in Borak simply cannot be justified in terms of statutory construction, see Hill, Constitutional Remedies, 69 Col. L. Rev. 1109, 1120-1121 (1969); nor did the Borak Court purport to do so. See Borak, supra, at 432-434. The notion of "implying" a remedy, therefore, as applied to cases like Borak, can only refer to a process whereby the federal judiciary exercises a choice among traditionally available judicial remedies according to reasons related to the substantive social policy embodied in an act of positive law. See ibid., and Bell v. Hood, supra, at 684.
[5] With regard to a court's authority to grant an equitable remedy, the line between "subject matter" jurisdiction and remedial powers has undoubtedly been obscured by the fact that historically the "system of equity `derived its doctrines, as well as its powers, from its mode of giving relief.' " See Guaranty Trust Co. v. York, supra, at 105, quoting C. Langdell, Summary of Equity Pleading xxvii (1877). Perhaps this fact alone accounts for the suggestion sometimes made that a court's power to enjoin invasion of constitutionally protected interests derives directly from the Constitution. See Bell v. Hood, 71 F. Supp. 813, 819 (SD Cal. 1947).
[6] Chief Judge Lumbard's opinion for the Court of Appeals in the instant case is, as I have noted, in accord with this conclusion:

"Thus, even if the Constitution itself does not give rise to an inherent injunctive power to prevent its violation by governmental officials there are strong reasons for inferring the existence of this power under any general grant of jurisdiction to the federal courts by Congress." 409 F. 2d, at 723.
The description of the remedy as "inferred" cannot, of course, be intended to assimilate the judicial decision to accord such a remedy to any process of statutory construction. Rather, as with the cases concerning remedies, implied from statutory schemes, see n. 4, supra, the description of the remedy as "inferred" can only bear on the reasons offered to explain a judicial decision to accord or not to accord a particular remedy.
[7] I express no view on the Government's suggestion that congressional authority to simply discard the remedy the Court today authorizes might be in doubt; nor do I understand the Court's opinion today to express any view on that particular question.
[8] And I think it follows from this point that today's decision has little, if indeed any, bearing on the question whether a federal court may properly devise remediesother than traditionally available forms of judicial relieffor the purpose of enforcing substantive social policies embodied in constitutional or statutory policies. Compare today's decision with Mapp v. Ohio, 367 U. S. 643 (1961), and Weeks v. United States, 232 U. S. 383 (1914). The Court today simply recognizes what has long been implicit in our decisions concerning equitable relief and remedies implied from statutory schemes; i. e., that a court of law vested with jurisdiction over the subject matter of a suit has the powerand therefore the dutyto make principled choices among traditional judicial remedies. Whether special prophylactic measureswhich at least arguably the exclusionary rule exemplifies, see Hill, The Bill of Rights and the Supervisory Power, 69 Col. L. Rev. 181, 182-185 (1969)are supportable on grounds other than a court's competence to select among traditional judicial remedies to make good the wrong done, cf. Bell v. Hood, supra, at 684, is a separate question.
[9] The same, of course, may not be true with respect to other types of constitutionally protected interests, and therefore the appropriateness of money damages may well vary with the nature of the personal interest asserted. See Monroe v. Pape, 365 U. S. 167, 196 n. 5 (HARLAN, J., concurring).
[1] J. Thayer, O. Holmes, & F. Frankfurter, John Marshall 88 (Phoenix ed. 1967).
[2] The Court reached the issue of applying the Weeks doctrine to the States sua sponte.
[3] What Cardozo suggested as an example of the potentially far-reaching consequences of the suppression doctrine was almost realized in Killough v. United States, 114 U. S. App. D. C. 305, 315 F. 2d 241 (1962).
[4] For example, in a case arising under Mapp, supra, state judges at every level of the state judiciary may find the police conduct proper. On federal habeas corpus a district judge and a court of appeals might agree. Yet, in these circumstances, this Court, reviewing the case as much as 10 years later, might reverse by a narrow margin. In these circumstances it is difficult to conclude that the policeman has violated some rule that he should have known was a restriction on his authority.
[5] Damage verdicts for such acts are often sufficient in size to provide an effective deterrent and stimulate employers to corrective action.
[6] Electronic eavesdropping presents special problems. See 18 U. S. C. §§ 2510-2520 (1964 ed., Supp. V).
[7] Any such legislation should emphasize the interdependence between the waiver of sovereign immunity and the elimination of the judicially created exclusionary rule so that if the legislative determination to repudiate the exclusionary rule falls, the entire statutory scheme would fall.
[*] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Rev. Stat. § 1979, 42 U. S. C. § 1983.