# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DION STARR,
            *Plaintiff-Appellant,*

v.

LEROY BACA, Los Angeles County
Sheriff; in his individual capacity,
            *Defendant-Appellee.*

No. 09-55233

D.C. No.
2:08-cv-00508-
GW-SH

ORDER AND
OPINION

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted
June 8, 2010—Pasadena, California

Filed July 25, 2011

Before: Stephen S. Trott and William A. Fletcher,
Circuit Judges, and Charles R. Breyer, District Judge.*

Opinion by Judge William A. Fletcher;
Dissent by Judge Trott

---

*The Honorable Charles R. Breyer, United States District Judge for the Northern District of California, sitting by designation.

## COUNSEL

Sonia Maria Mercado, R. Samuel Paz, LAW OFFICES OF R. SAMUEL PAZ, Culver City, California, for the plaintiff-appellant.

Melinda Cantrall, Adrianna Corrado, HURRELL & CANTRALL LLP, Los Angeles, California, for defendant-appellee Baca.

## ORDER

The opinion filed on February 11, 2011, and published at 633 F.3d 1191 (9th Cir. 2011), is withdrawn and replaced by the attached opinion.

The petitions for rehearing and for rehearing en banc, filed February 25, 2011, are hereby denied as moot.

No new petitions for rehearing or petitions for rehearing en banc shall be accepted in this case. However, any member of this court may make a sua sponte en banc call challenging the opinion filed today.

## OPINION

W. FLETCHER, Circuit Judge:

Plaintiff Dion Starr brings a § 1983 action for damages resulting from a violent attack he allegedly suffered while he was an inmate in the Los Angeles County Jail. The district court dismissed Starr's supervisory liability claim for deliberate indifference against Sheriff Leroy Baca in his individual capacity under Federal Rule of Civil Procedure 12(b)(6). Because we hold that Starr has adequately stated a claim, we reverse and remand for further proceedings.

### I. Background

Starr's Third Amended Complaint alleges that on or about January 27, 2006, he was in custody in the Los Angeles County Jail. A group of inmates gathered at his cell door and threatened to inflict physical harm on him. He yelled for the deputies guarding the jail to come to his aid. Instead of protecting him, a deputy opened Starr's cell gate in order to allow the group of inmates to enter. The inmates entered the cell and

repeatedly stabbed Starr and his cellmate with knife-like objects. They stabbed Starr twenty-three times while Starr screamed for help and protection. After the attacking inmates left the cell, several deputies went to Starr. Starr lay on the floor of his cell, seriously injured, bleeding and moaning in pain. One deputy yelled at him, "nigger lay down." While repeatedly yelling "shut up nigger," the deputy then kicked his face, nose, and body numerous times, causing pain, bleeding and a nose fracture. Other deputies stood by and watched. The deputy who kicked Starr subsequently interfered with his ability to obtain medical treatment for his injuries. Starr continues to suffer from and receive treatment for his injuries.

Starr sued Sheriff Baca as well as the deputies directly involved in the attack. His claims against the deputies are not at issue in this appeal. In his claim against Sheriff Baca, Starr alleges unconstitutional conditions of confinement in violation of the Eighth and Fourteenth Amendments. He alleges that Sheriff Baca is liable in his individual capacity because he knew or should have known about the dangers in the Los Angeles County Jail, and that he was deliberately indifferent to those dangers.

After giving Starr several chances to plead his claim against Sheriff Baca, the district court dismissed the claim with prejudice under Rule 12(b)(6). The district court held that Starr's allegations against Sheriff Baca were insufficient to state a supervisory liability claim for deliberate indifference because the complaint's recital of prior incidents and accompanying allegations did not sufficiently state a causal connection between Sheriff Baca's action and inaction and the alleged injury to Starr. The district court wrote that Starr "does not allege that Baca himself directly participated in any way in the January 27, 2006 incident or that he was involved in any review or investigation of it." Nor, the district court held, did Starr allege any specific policy implemented by Sheriff Baca that caused the violation.

The district court directed that final judgment in favor of Sheriff Baca be entered under Federal Rule of Civil Procedure 54(b). Starr appeals.

## II. Standard of Review

We review de novo a district court's dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 811-12 (9th Cir. 2010).

## III. Discussion

To prevail on his claim under the Eighth and Fourteenth Amendments, Starr must demonstrate "either that prison officials acted with 'deliberate indifference' or that their conduct was so reckless as to be tantamount to a desire to inflict harm." *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1449 (9th Cir. 1991). The gravamen of Starr's claim against Sheriff Baca is deliberate indifference.

On appeal, Starr contends that the district court erred in dismissing his claim against Sheriff Baca on the pleadings. Sheriff Baca contends that the Supreme Court eliminated all claims for supervisory liability — including deliberate indifference claims — in its decision in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009). He contends, further, that even under pre-*Iqbal* case law, Starr has not alleged a causal connection between Sheriff Baca's conduct and his injury. Finally, he contends that Starr has failed to allege anything more than legal conclusions, rendering the complaint insufficient under Federal Rule of Civil Procedure 8(a), as interpreted by *Iqbal*.

Because the question of whether *Iqbal* eliminated supervisory liability claims based on deliberate indifference was not adequately briefed, we ordered supplemental briefing after oral argument. Having reviewed the original and supplemental briefing, we now address the parties' arguments.

## A. Supervisory Liability for Deliberate Indifference after *Iqbal*

We have long permitted plaintiffs to hold supervisors individually liable in § 1983 suits when culpable action, or inaction, is directly attributed to them. We have never required a plaintiff to allege that a supervisor was physically present when the injury occurred. In *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991), we explained that to be held liable, the supervisor need not be "directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury." *Id.* at 645. Rather, the supervisor's participation could include his "own culpable action or inaction in the training, supervision, or control of his subordinates," "his acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 646 (internal citations, quotation marks, and alterations omitted).

After the district court dismissed Starr's claim, but before briefing on appeal, the Supreme Court decided *Iqbal*. Plaintiff Iqbal, a Pakistani Muslim, had been arrested and detained in severely restrictive conditions following the attacks of September 11, 2001. *Id.* at 1943. He filed a *Bivens* action in federal court against his jailers and various officials, including Attorney General John Ashcroft and F.B.I. Director Robert Mueller, alleging purposeful discrimination on the basis of race, religion and national origin. *Id.* (citing *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971)). A *Bivens* action seeks to hold federal officers individually liable for constitutional violations. Although "more limited in some respects," a *Bivens* action is the federal analog to an action against state or local officials under § 1983. *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006).

The Court held that Iqbal's complaint failed to plead facts sufficient to state a claim against Attorney General Ashcroft

and Director Mueller for purposeful and unlawful discrimination. *Iqbal*, 129 S. Ct. at 1954. The Court explained that because *Bivens* and § 1983 suits do not allow for the imposition of vicarious liability, stating a claim against a government official in his or her individual capacity for purposeful discrimination requires pleading that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948.

**[1]** The Court stated that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.* The Court explained that purposeful discrimination, which was alleged against Attorney General Ashcroft and Director Mueller, requires a plaintiff to "plead and prove that the defendant acted with discriminatory purpose." *Id.* Proving purposeful discrimination requires showing "more than intent as volition or intent as awareness of consequences"; the plaintiff must show that the decisionmaker acted because of his action's adverse effects, not merely in spite of them. *Id.* (internal quotation marks omitted). Therefore, the supervisors in *Iqbal* needed to have "adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin." *Id.* at 1948-49. Holding Attorney General Ashcroft and Director Mueller personally liable for unconstitutional discrimination if they did not themselves have a discriminatory purpose would be equivalent to finding them vicariously liable for their subordinates' violation, which *Bivens* and § 1983 do not allow. In so holding, *Iqbal* followed earlier cases holding that alleging a supervisor's mere awareness of the discriminatory effects of his or her actions or inaction does not state a claim of unconstitutional discrimination.

**[2]** Starr does not allege purposeful discrimination by Sheriff Baca. Rather, he alleges unconstitutional conditions of confinement in violation of the Eighth Amendment's prohibition against cruel and unusual punishment, as incorporated

through the Due Process Clause of the Fourteenth Amendment. A claim of unconstitutional conditions of confinement, unlike a claim of unconstitutional discrimination, may be based on a theory of deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825 (1994). A showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the involvement — and the liability — of that supervisor. Thus, when a supervisor is found liable based on deliberate indifference, the supervisor is being held liable for his or her own culpable action or inaction, not held vicariously liable for the culpable action or inaction of his or her subordinates.

**[3]** We see nothing in *Iqbal* indicating that the Supreme Court intended to overturn longstanding case law on deliberate indifference claims against supervisors in conditions of confinement cases. We also note that, to the extent that our sister circuits have confronted this question, they have agreed with our interpretation of *Iqbal*. *See Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010) ("We therefore conclude that after *Iqbal,* Plaintiff can no longer succeed on a § 1983 claim against Defendant by showing that as a supervisor he behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, *unless that is the same state of mind required for the constitutional deprivation he alleges*." (emphasis added; internal quotation marks omitted)); *Sandra T.E. v. Grindle*, 599 F.3d 583, 591 (7th Cir. 2010) (*Iqbal* does not change the fact that "[w]hen a state actor's deliberate indifference deprives someone of his or her protected liberty interest in bodily integrity, that actor violates the Constitution, regardless of whether the actor is a supervisor or subordinate, and the actor may be held liable for the resulting harm."); *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) ("Although 'Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*,' supervisory officials may be liable on

the basis of their own acts or omissions," including supervis-
ing "with deliberate indifference toward the possibility that
deficient performance of the task may contribute to a civil
rights deprivation." (quoting *Iqbal*, 129 S. Ct. at 1948) (some
internal quotation marks omitted)).

**[4]** We therefore conclude that a plaintiff may state a claim
against a supervisor for deliberate indifference based upon the
supervisor's knowledge of and acquiescence in unconstitu-
tional conduct by his or her subordinates.

### B.    Supervisory Liability for Deliberate Indifference

Sheriff Baca contends that even under a deliberate indiffer-
ence standard Starr has failed to state a claim for supervisory
liability. He contends that Starr's claim fails for want of a
causal connection between Sheriff Baca's allegedly wrongful
action and inaction and Starr's alleged injury. We disagree.

**[5]** A defendant may be held liable as a supervisor under
§ 1983 "if there exists either (1) his or her personal involve-
ment in the constitutional deprivation, or (2) a sufficient
causal connection between the supervisor's wrongful conduct
and the constitutional violation." *Hansen v. Black*, 885 F.2d
642, 646 (9th Cir. 1989). "[A] plaintiff must show the super-
visor breached a duty to plaintiff which was the proximate
cause of the injury. The law clearly allows actions against
supervisors under section 1983 as long as a sufficient causal
connection is present and the plaintiff was deprived under
color of law of a federally secured right." *Redman*, 942 F.2d
at 1447 (internal quotation marks omitted).

**[6]** "The requisite causal connection can be established . . .
by setting in motion a series of acts by others," *id.* (alteration
in original; internal quotation marks omitted), or by "know-
ingly refus[ing] to terminate a series of acts by others, which
[the supervisor] knew or reasonably should have known
would cause others to inflict a constitutional injury," *Dubner*

*v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (internal alteration and quotation marks omitted).

Our decision in *Redman* is illustrative. In *Redman*, the plaintiff alleged that the facility in which he was confined was overcrowded; that the Sheriff knew the facility was not a proper place to detain him and posed a risk of harm but had placed him there anyway; and that the Sheriff was ultimately in charge of the facility's operations. 942 F.2d at 1446-47. Reversing the district court's grant of a directed verdict in favor of the Sheriff, we concluded that a reasonable jury could have found that the Sheriff was deliberately indifferent to the plaintiff's safety. *Id.* at 1447-48. Such a jury could have found that the Sheriff "knew or reasonably should have known of the overcrowding" and that "he acquiesced in a deficient policy that was a moving force behind" the harm caused to the plaintiff. *Id.* at 1447.

**[7]** Starr alleges that Sheriff Baca's knowledge of the unconstitutional conditions in the jail, including his knowledge of the culpable actions of his subordinates, coupled with his inaction, amounted to acquiescence in the unconstitutional conduct of his subordinates. As we noted in *Redman*, under California law, "[t]he sheriff is required by statute to take charge of and keep the county jail and the prisoners in it, and is answerable for the prisoner's safekeeping." *Id.* at 1446 (citing Cal. Gov. Code §§ 26605, 26610; Cal. Penal Code § 4006). We have held that "acquiescence or culpable indifference" may suffice to show that a supervisor "personally played a role in the alleged constitutional violations." *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005); *see Redman*, 942 F.2d at 1446. Starr's allegations that the actions

or inactions of the person "answerable for the prisoner's safe-keeping" caused his injury are therefore sufficient to state a claim of supervisory liability for deliberate indifference.

### C.   Adequacy of Starr's Complaint Under Rule 8(a)

Finally, Sheriff Baca argues that even if Starr's complaint might be read to state a claim of deliberate indifference, it does not satisfy the pleading standard that the Court in *Iqbal* held Federal Rule of Civil Procedure 8(a) to require. Our dissenting colleague agrees with the district court that Starr has not satisfied the pleading requirements of Rule 8(a), as interpreted by *Iqbal*. He writes, "Plaintiff's complaint does nothing more than allege raw legal conclusions with insufficient facts to support them." Diss. Op. at 9824. We disagree.

### 1.   Allegations of the Complaint

Starr claims that Sheriff Baca failed to act to protect inmates under his care despite his knowledge that they were in danger because of culpable acts of his subordinates and despite his ability to take actions that would have protected them. To use language from our prior opinions, Starr claims that Sheriff Baca "knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known would cause . . . constitutional injury." *Dubner*, 266 F.3d at 968. Or, to state it slightly differently, Starr claims that Sheriff Baca is "liable in his individual capacity for his own culpable action *or inaction* in the training, supervision, or control of his subordinates[.]" *Watkins*, 145 F.3d at 1093 (emphasis added; internal quotation marks omitted).

It is somewhat tedious to recount the many allegations in the complaint detailing what Sheriff Baca knew or should have known, and what Sheriff Baca did or failed to do. But given our colleague's conclusion that Starr's complaint has not satisfied Rule 8(a), we feel obliged to do so.

In paragraph 36, Starr alleges that the United States Department of Justice ("DOJ") initiated an investigation into conditions at Los Angeles County Jails in June 1996. On September 5, 1997, the DOJ "gave BACA, then a supervisor, clear written notice in a 'findings letter' of a continued and serious pattern and practices of constitutional violations including[ ] abuse of inmates by sheriff's deputies working in the jail and inmate on inmate violence."

In paragraph 37, Starr alleges that Sheriff Baca receives "weekly reports from his subordinates responsible for reporting deaths and injuries in the jails," and receives "ongoing reports of his Special Counsel and Office of Independent Review."

In paragraph 38, Starr alleges that in 1999, "under threat of a lawsuit by the DOJ, BACA and the COUNTY submitted to a Memorandum of Understanding ("MOU") with the DOJ which required BACA and the COUNTY to address and correct the continuous constitutional violations to which inmates were being subjected, particularly inmates suffering from mental problems. BACA personally signed the MOU. However, after years of monitoring the County Jail system, under the authority of the MOU, in 2006, the DOJ experts issued a report which still found noncompliance with many of its recommendations regarding the abuse of inmates and the deficiencies which continue at county jails[.]"

In paragraph 39, Starr alleges that on July 6, 2002, "Ramon Gavira was severely beaten by a female deputy and later . . . was killed in his cell at [the] county jail. Deputies and staff testified that they were not investigated nor disciplined for lapses in supervision of Mr. Gavira and allegations that Mr. Gavira had been physically abused by deputies. BACA was personally advised of the failure to investigate and no discipline being imposed[.]"

In paragraph 40, Starr alleges that on March 23, 2003, "BACA was . . . again made aware of Hispanic inmate gangs

attacking African Americans and the failure to provide reasonable security when the COUNTY and LASD [Los Angeles County Sheriff's Department] approved a settlement in a civil action where Ahmad Burrell, Rory Fontanelle, and Aaron Cunningham were attacked over a three day period, sustaining serious injuries. Although the deputies had known that Hispanic gangs were going to attack African Americans, . . . the deputies failed to provide reasonable security and Burrell was attacked in the housing dormitory and the attackers were able to stab him twenty-four (24) times, some causing serious and permanent injury to his abdomen and head."

In paragraph 41, Starr alleges that on October 21, 2003, "inmate Ki Hong was killed by three inmates who entered the dayroom where Hong was housed. . . . Notice of numerous violations showing deputies failing to provide reasonable security and abandoning their duties, their lax discipline and failure to supervise were given to BACA by his in-house lawyers, yet the inmate on inmate violence continued. This was the first of five inmate-on-inmate killings that occurred in the jail system over a six-month period."

In paragraph 42, Starr alleges that on December 6, 2003, "Inmate Prendergast was beaten periodically over several hours from about 6:00 p.m., to early next morning by . . . two of his three cellmates. . . . Again, notice of numerous violations showing deputy failing to provide reasonable security to the entire cell block, lax discipline and failure to supervise were presented to BACA, yet the inmate on inmate violence continued."

In paragraph 43, Starr alleges that on December 9, 2003, "inmate Mario Alvarado . . . was killed in a holding cell. . . . Deputies responsible for providing reasonable security failed to . . . do so, and the inmates who beat Alvarado had so much time they [were able to] conceal[ ] his dead body under clothes and trash . . . . Again, notice of numerous violations showing deputy failing to provide reasonable security to

the holding cell, lax discipline and failure to supervise were presented to BACA[.]"

In paragraph 44, Starr alleges that on December 13, 2003, a deputy falsified the contents of a statement by a pre-trial detainee, Jose Beas, so that the falsified statement recounted that Beas had admitted to inappropriate touching of a minor. Beas was classified as an inmate who should be kept away from the general prison population, and was "given a wrist band that identified him as such," but he was placed in a holding tank with "general population inmates." "Beas was immediately beaten by the other inmates and suffered brain damage. BACA was named as a defendant in that civil case and knew of the allegations of failure to provide reasonable security to the holding cell, lax discipline and failure to supervise[,] and [he] approved the settlement[.]"

In paragraph 45, Starr alleges that on January 12, 2004, "inmate Kristopher Faye was stabbed to death by several inmates with jail-made knives. . . . Fay[e] was African American and the attackers were Hispanic. Deputies responsible for keeping the cell gates in the housing module close[d] allowed all the cell gates in the module to remain open which increased the danger of violence and was in violation of LASD policy. . . . Numerous violations showing errors in classification, placing highly dangerous inmates with histories of violence with nonviolent inmates presenting low security risk, deputy failing to provide reasonable security to the holding cell, lax discipline and failure to supervise were again presented to BACA in official reports[.]"

In paragraph 46, Starr alleges that on April 20, 2004, "inmate Raul Tinajero was killed in his cell in the jail, by inmate Santiago Pineda. Pineda had a history of prior misconduct in the jail[.] . . . Tinajero was to be a witness in a criminal case against Pineda. . . . Due to the monitoring failures of the deputies and inadequate procedures with regard to the escorting of inmates, Pineda was able to enter Tinajero's cell unchallenged

by the deputies responsible for providing reasonable security, kill Tinajero undetected, [and] remain in Tinajero's cell for five hours undetected by deputies. Numerous violations showing errors in classification, deputies failing to provide reasonable security to the housing cells, lax discipline and failure to supervise were again presented to BACA in official reports[.]"

In paragraph 47, Starr alleges that on May 23 or 24, 2004, inmate Antonio Fernandez was killed by other inmates in the dormitory. "The deputy that was assigned to monitor the dormitory had abandoned her duties and left her post unattended, and the post was vacant for approximately 20 minutes during which time the assault occurred. . . . [T]he failure to provide reasonable security to [the] housing area, lax discipline and failure to supervise were again presented to BACA[.]"

In paragraph 48, Starr alleges, "BACA received notice from The Special Counsel to the Los Angeles County Sheriff's Department, in the 17th Semiannual Report (February 2004) and the 18th Semiannual Report (August 2004) of increasing levels of inmate violence in the jails."

In paragraph 49, Starr alleges that in "February 2005 BACA received notice from The Special Counsel to the Los Angeles County Sheriff's Department, in the 19th Semiannual Report that his deputies['] conduct was . . . costing county tax payers millions of dollars annually in payments of civil judgments and settlements, in cases where the internal investigations had found no wrong doing. In all, BACA was notified by his Special Counsel that . . . of twenty-nine (29) cases involving police misconduct [that] settled for $100,000 or more over the past five years, only eight resulted in any type of discipline to the involved officers or policy change in the Department."

In paragraph 50, Starr alleges that on February 3, 2005, Special Counsel Merrick Bobb presented to BACA a finding

of inmate abuse, contained in a report to the Los Angeles County Board of Supervisors. The report found "that 'Los Angeles County's largest jail is so outdated, understaffed and riddled with security flaws that it jeopardizes the lives of guards and inmates.' The Special Counsel's report criticized the County Jail in downtown Los Angeles for 'failing to prevent dangerous inmates from being housed with lower-risk inmates . . . .' The report concluded that Men[']s[ ] Central Jail 'is nightmarish to manage' and suffers from 'lax supervision and a long-standing jail culture that has shortchanged accountability for inmate safety and security.' "

In paragraph 52, Starr alleges that on October 24, 2005, Chadwick Shane Cochran was booked into county jail for a nonviolent misdemeanor. Due to mental health difficulties, Cochran was classified to be placed in a mental health facility located within the jail. "Due to errors by staff his protective housing was terminated and he was sent to general population on November 16, 2005, where he was beaten to death a few hours later that day. Deputies compounded the error of removing Cochran from protective status and left a red color identification card which led the attacking inmates to believe that he was a 'snitch' or informant. The deputies responsible for the safety of inmates abandoned their post and supervision of the locked day room in which 40 other inmates, some of whom were classified as violent 'high risk' accused murderers and gang members, and known violent offenders. Cochran was screaming and many other inmates were yelling for them to stop, but no deputy resumed their responsibility to provide reasonable security until the inmates had grown tired of beating Cochran and hid his body under clothing and food trays. The numerous errors in classification, deputies failing to provide reasonable security to the day room housing cells, lax discipline and failure to supervise were again presented to BACA in official reports[.]"

In paragraphs 13 through 19, Starr alleges that he was attacked three months after Cochran was killed. We recounted

the details of this alleged attack at the beginning of our opinion.

In paragraph 32, Starr alleges that Sheriff "BACA knew or reasonabl[y] could have known[ ] of his subordinates' ongoing constitutional violations . . . , of the failure to provide reasonable security at the jail, failure to prevent inmate on inmate violence, failure to monitor inmates, lax or no supervision by his subordinate supervisors, use of excessive force on inmates, failure to investigate incidents . . . involving inmate on inmate violence, failure to protect, failure to implement indicated policies and procedures regarding, including but not limited to[,] the use of inmates as trustees[.] BACA failed to act to prevent his subordinates['] ongoing unconstitutional conduct[;] . . . he acquiesced, condoned or ratified a custom, practice or policy of ongoing misconduct by his subordinate deputies and supervisors." In paragraph 35, Starr alleges that "Sheriff BACA . . . became aware, or should have become aware, and should have taken corrective actions to prevent repeated incidents" of derelictions of duty by his subordinates.

### 2. Pleading Standards under Rule 8(a)

**[8]** We hold that the foregoing allegations are sufficient to satisfy Rule 8(a). The text of Rule 8(a) has not been changed since the initial promulgation of the Federal Rules of Civil Procedure in 1938. In relevant part, it provides:

> (a) Claim for Relief. A pleading that states a claim for relief must contain:
>
> . . .
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief[.]

The theory of Rule 8(a), and of the federal rules in general, is notice pleading. The 1938 federal rules replaced a system

in which the federal trial courts had followed the procedural rules of the different states in which they sat. Conformity Act of 1872, Act of June 1, 1872, ch. 225, § 5, 17 Stat. 196, 197 (codified in Rev. Stat. § 914 (1878)). Ever since 1938, the federal civil rules have been applicable in all federal courts. They apply uniformly to all civil cases, whatever the cause of action or subject matter of the suit. *See* Fed. R. Civ. P. 1 ("These rules govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81.").

The state pleading rules had largely required code, or fact, pleading, under which pleaders were required to allege very specifically the factual bases for their claims. By contrast, under the federal rules a complaint is required only to give the notice of the claim such that the opposing party may defend himself or herself effectively. The theory of the federal rules is that once notice-giving pleadings have been served, the parties are to conduct discovery in order to learn more about the underlying facts. When they have learned the facts, the parties can settle or seek judgment. If the case does not settle but the material facts are clear, the court will grant summary judgment. If material facts are genuinely disputed, the case will go to trial. That, in any event, is the theory.

In practice, the operation of the federal pleading rules is more nuanced. In some cases, particularly in complex commercial cases, notice pleading rules give an advantage — perhaps an unfair advantage — to the plaintiff. If a plaintiff can survive a motion to dismiss on the pleadings in such cases, he or she can put the defendant to enormous expense in discovery. In practical terms, this means that the settlement value of a suit jumps substantially the moment the complaint survives a motion to dismiss. In recognition of this practical reality, Congress took some aspects of pleading in federal securities cases out of the federal rules entirely, imposing by statute something like the old code pleading system, as a way of protecting defendants from some of the settlement pressures that

exist under the Rule 8(a) regime. Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. 104-67, 109 Stat. 737, Title I, § 101, codified at 15 U.S.C. § 78u-4(b); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Exacting pleading requirements are among the control measures Congress included in the PSLRA. The PSLRA Act requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter."); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) ("All securities fraud complaints since 1995 . . . are subject to the more exacting pleading requirements of the PSLRA, which significantly altered pleading requirements in securities fraud cases." (internal quotation marks omitted)).

In several recent cases, without benefit of statute, the Supreme Court has applied what appears to be higher pleading standard under Rule 8(a). In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Court dealt with allegations of damage causation in a federal securities case; this allegation was not covered by the new higher pleading standard imposed by the PSLRA. The Court "assume[d], at least for argument's sake, that neither [Rule 8(a)(2)] nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss." *Id.* at 346. After "conced[ing] that ordinary pleading rules are not meant to impose a great burden upon a plaintiff," the Court wrote,

> At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid. Cf. H. R. Conf. Rep. No. 104-369, p. 31 (1995) . . . (criticizing "abusive" practices including "the routine filing of lawsuits . . . with only [a] faint hope that the discovery process might lead to some plausible cause of action."). It would permit a plain-

tiff "with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence." *Blue Chip Stamps* [*v. Manor Drug Stores*], 421 U.S. [723, 741 (1975).

*Id.* at 347 (some alterations in original).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), plaintiff alleged a violation of Section 1 of the Sherman Act. Applying the pleading standard of Rule 8(a), the Court wrote "that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice," *id.* at 556, even though the existence of parallel conduct and a conspiracy would violate Section 1. The Court required more than just notice of the claim. It required that the claim be plausible. "[W]e hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*

The Court made clear in *Twombly* that it was concerned that lenient pleading standards facilitated abusive antitrust litigation. It provided, with approval, the following citation:

> *See also Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (C.A.7 1984) ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint")[.]

*Id.* at 558. The Court wrote, further, "Probably, then, it is only by taking care to require allegations that reach the level sug-

gesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support a § 1 claim. *Dura*, 544 U.S. at 347." *Id.* at 559-60 (some internal quotation marks omitted).

Finally, in *Iqbal*, plaintiff Iqbal, a Muslim American man, brought a *Bivens* action alleging deliberate discrimination by Attorney General Ashcroft and F.B.I. Director Mueller. Applying Rule 8(a), the Court held that the allegations in Iqbal's complaint were insufficient. In the Court's view, some of Iqbal's allegations were "bare assertions" not entitled to the presumption of truth, and the remaining allegations, even assumed to be true, did not plausibly suggest an entitlement to relief.

The Court first identified allegations not entitled to the presumption of truth. Iqbal's complaint alleged that defendants " 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest.' " *Id.* at 1951 (alterations in original). The complaint alleged, further, that "Ashcroft was the 'principal architect' of this invidious policy, . . . and that Mueller was 'instrumental' in adopting and executing it[.]" *Id.* The Court held that these "bare assertions" "amount[ed] to nothing more than a 'formulaic recitation of the elements' " of the constitutional claim. *Id.* (quoting *Twombly*, 550 U.S. at 555). Their "conclusory nature . . . disentitle[d] them to the presumption of truth." *Id.*

The Court then determined whether the remaining allegations, assumed to be true, "plausibly suggest[ed] an entitlement to relief." *Id.* The complaint alleged that the two defendants had caused the arrest and detention of "thousands of Arab Muslim men . . . as part of [the government's] investigation of the events of September 11." *Id.* It alleged that the defendants had "purposefully designat[ed] detainees 'of high

interest' because of their race, religion, or national origin." *Id.* The Court held that, assuming these facts to be true, they did not plausibly suggest Iqbal's entitlement to relief based on purposeful racial or religious discrimination because there was an " 'obvious alternative explanation' " for these facts. *Id.* (quoting *Towmbly*, 550 U.S. at 567). In the Court's view, the obvious alternative explanation was that the "September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group." *Id.* "It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims. On the facts respondent alleges the arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts." *Id.* The Court concluded that this alternative explanation was so likely to be true that, as between the two explanations, Iqbal's explanation was not plausible: "[T]he "purposeful, invidious discrimination respondent asks us to infer . . . *is not a plausible conclusion.*" *Id.* at 1951-52 (emphasis added).

In two cases decided during roughly the same period, the Court appears to have applied the original, more lenient version of Rule 8(a). In *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002), the Second Circuit had dismissed plaintiff's employment discrimination case for failure to plead facts establishing a prima facie case of discrimination. The Supreme Court reversed, writing:

> [P]etitioner's complaint easily satisfies the requirements of Rule 8(a) because it gives respondent fair notice of the basis for petitioner's claims. Petitioner alleged that he had been terminated on account of his national origin in violation of Title

VII and on account of his age in violation of the ADEA. His complaint detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved in his termination. These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest. . . .

*Respondent argues that allowing lawsuits based on conclusory allegations of discrimination to go forward will burden the courts and encourage disgruntled employees to bring unsubstantiated suits. Whatever the practical merits of this argument, the Federal Rules do not contain a heightened pleading standard for employment discrimination suits.* . . . Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits. "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer*, 416 U.S., at 236.

*Id.* at 514-15 (emphasis added) (some citations omitted).

In *Erickson v. Pardus*, 551 U.S. 89 (2007) (per curiam), the Tenth Circuit had dismissed an Eighth and Fourteenth Amendment deliberate indifference claim for failure to satisfy Rule 8(a). Plaintiff, an inmate in a Colorado state prison, had "alleged that a liver condition resulting from hepatitis C required a treatment program that officials had commenced but then wrongfully terminated, with life-threatening consequences." *Id.* at 89-90. The Tenth Circuit deemed the allegations of the complaint "conclusory" and dismissed on the pleadings. *Id.* at 90. The Court emphatically disagreed: "The holding departs in so stark a manner from the pleading standard mandated by the Federal Rules of Civil Procedure that we grant review." *Id.* The Court wrote, "[The complaint] alleged this medication was withheld 'shortly after' petitioner

had commenced a treatment program that would take one year, that he was 'still in need of treatment for this disease,' and that the prison officials were in the meantime refusing to provide treatment. This alone was enough to satisfy Rule 8(a)(2)." *Id.* at 94 (citations omitted).

The juxtaposition of *Swierkiewicz* and *Erickson*, on the one hand, and *Dura*, *Twombly*, and *Iqbal*, on the other, is perplexing. Even though the Court stated in all five cases that it was applying Rule 8(a), it is hard to avoid the conclusion that, in fact, the Court applied a higher pleading standard in *Dura*, *Twombly* and *Iqbal*. The Court in *Dura* and *Twombly* appeared concerned that in some complex commercial cases the usual lenient pleading standard under Rule 8(a) gave too much settlement leverage to plaintiffs. That is, if a non-specific complaint was enough to survive a motion to dismiss, plaintiffs would be able to extract undeservedly high settlements from deep-pocket companies. In *Iqbal*, by contrast, the Court was concerned that the usual lenient standard under Rule 8(a) would provide too little protection for high-level executive branch officials who allegedly engaged in misconduct in the aftermath of September 11, 2001. To the extent that we perceive a difference in the application of Rule 8(a) in the two groups of cases, it is difficult to know in cases that come before us whether we should apply the more lenient or the more demanding standard.

[9] But whatever the difference between these cases, we can at least state the following two principles common to all of them. First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

### 3.    Evaluation of Starr's Complaint

Viewed in the light of all of the Supreme Court's recent cases, we hold that the allegations of Starr's complaint satisfy the standard of Rule 8(a). We do not so hold merely because Starr's complaint, like the complaint in *Erickson*, alleges deliberate indifference in violation of the Eighth and Fourteenth Amendments. Rather, we so hold because his complaint complies with the two principles just stated.

[10] First, Starr's complaint makes detailed factual allegations that go well beyond reciting the elements of a claim of deliberate indifference. These allegations are neither "bald" nor "conclusory," and hence are entitled to the presumption of truth. *Iqbal*, 129 S. Ct. at 1951. Starr specifically alleges numerous incidents in which inmates in Los Angeles County jails have been killed or injured because of the culpable actions of the subordinates of Sheriff Baca. The complaint specifically alleges that Sheriff Baca was given notice of all of these incidents. It specifically alleges, in addition, that Sheriff Baca was given notice, in several reports, of systematic problems in the county jails under his supervision that have resulted in these deaths and injuries. Finally, it alleges that Sheriff Baca did not take action to protect inmates under his care despite the dangers, created by the actions of his subordinates, of which he had been made aware. These incidents are sufficiently detailed to give notice to Sheriff Baca of the nature of Starr's claim against him and to give him a fair opportunity to defend against it. They are far from the "bare assertion" in *Iqbal* that defendants subjected Iqbal to harsh conditions of confinement "solely on account" of his "religion, race, and/or national origin." *Id.*

[11] Second, the factual allegations in Starr's complaint plausibly suggest that Sheriff Baca acquiesced in the unconstitutional conduct of his subordinates, and was thereby deliberately indifferent to the danger posed to Starr. There is no "obvious alternative explanation," within the meaning of

*Iqbal*, for why Sheriff Baca took no action to stop his subordinates' repeated violations of prisoners' constitutional rights despite being repeatedly confronted with those violations, such that the alternative explanation requires us to conclude that Starr's explanation "is not a plausible conclusion." *Iqbal*, 129 S.Ct. at 1951, 1952. If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible. The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable. The factual allegations of the complaint need only "plausibly suggest an entitlement to relief." *Id.* at 1951. As the Court wrote in *Twombly*, Rule 8(a) "*does not impose a probability requirement at the pleading stage*; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" to support the allegations. *Twombly*, 550 U.S. at 556 (emphasis added). Starr's complaint satisfies that standard.

### Conclusion

**[12]** We hold that the Supreme Court's decision in *Iqbal* did not alter the substantive requirements for supervisory liability claims in an unconstitutional conditions of confinement case under the Eighth and Fourteenth Amendments where deliberate indifference is alleged. We further hold that Starr has sufficiently alleged under Rule 8(a) a supervisory liability claim of deliberate indifference against Sheriff Baca. We therefore reverse the district court's dismissal of Starr's claim against Sheriff Baca and remand for further proceedings.

**REVERSED AND REMANDED.**

TROTT, Circuit Judge, Dissenting:

I respect my experienced colleagues' evaluation of Starr's final complaint, but my view of it is different. In the main, his complaint has all the hallmarks of an attempted end run around the prohibition against using the vicarious liability doctrine of respondeat superior to get at the boss.

Judge Fletcher accurately describes what Starr must allege to support an actionable claim of *individual* supervisory liability for deliberate indifference, but I respectfully disagree that Starr's complaint measures up to that standard. Yes, we have held that "acquiescence or culpable indifference" may suffice to show that a supervisor "personally played a role in the alleged constitutional violations," *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005); but simply alleging generally that the Sheriff is "answerable for the prisoner's safe-keeping" doesn't cut it. *Id.* Plaintiff's complaint does nothing more than allege raw legal conclusions with insufficient facts to support them. Starr's complaint runs afoul of our Circuit's rule that to establish a claim for individual supervisory liability, a plaintiff *must allege facts*, not simply conclusions; and those facts must show that the individual sued was personally involved in the alleged deprivation of the plaintiff's civil rights. *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Otherwise, the action fails for failure to state a viable claim. *Id.* Even if Judge Fletcher is correct that "supervisory liability" survives *Iqbal*, a plaintiff must still allege *facts* to get into court.

Here, I pause for a moment to underscore and to highlight a critical aspect of the causation aspect of this issue that too often is lost in the undertow of the jailhouse activities of which the plaintiff complains: this part of Starr's case is a claim not under *Monell* for an actionable governmental policy or custom or practice, but a claim for *individual* responsibility — not agency or department or political unit responsibility, but *individual* responsibility. It follows as night the day that

the individual under scrutiny must have personally engaged in identifiably actionable behavior, even with respect to a claim of deliberate indifference. As Judge Wu correctly explained,

> A supervisor may be liable if there exists either "(1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." . . . As the Ninth Circuit explained in *Redman v. County of San Diego*, 942 F.2d 1435, 1446-47 (9th Cir. 1991):
>
> > This latter liability is not a form of vicarious liability. Rather, it is direct liability. Under direct liability, plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury. The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right. "The requisite causal connection can be established . . . by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978).

We are evaluating Starr's *revised third* amended complaint. The district court gave him multiple opportunities factually to amend to articulate the Sheriff's personal involvement in this matter. In particular, the court requested on November 6, 2006, that Starr "state precisely the basis for the claims as to defendant L. Baca in the [anticipated] revised third amended complaint." In response, Starr alleged only more conclusions and vague and insufficient allegations that the Sheriff (1)

"knew or reasonably *could* have known," (2) "knew or reasonably *should* have known," and (3) was "aware or *should* have become aware" of the jail conditions of which Starr complains. He sums up his boilerplate allegations with a statement that the Sheriff is liable because he had *either* "personal knowledge or *constructive* knowledge" of all these conditions. Alleging that the Sheriff "*could*" have known, "*should*" have known, and "*should*" have become aware is tantamount to admitting that Starr had no facts to support his allegations. The test that governs this case consists of two words, not one. Indifference is not enough. For indifference to be actionable, it must be deliberate. Starr's conclusory allegations amount to no more than formulaic flak fired into the sky in an attempt to bring down the squadron leader.

When we cease to look at the Los Angeles Sheriff's Department (LASD) as an abstraction and look at the reality, we see good reasons for requiring facts before permitting lawsuits against the Sheriff himself: the agency is gigantic. The LASD is the largest Sheriff's Department in the world. It covers 3,171 square miles, 2,557,754 residents, and by contract 42 of the 88 incorporated cities in Los Angeles County. The Department employs 8,400 law enforcement officers and 7,600 civilians and is responsible for 48 courthouses and 23 substations. The Men's Central Jail alone houses a revolving population of 5,000 inmates. In addition, the Department operates the Twin Towers Correctional Facility, the Mira Loma Detention Facility, the Pitchess Detention Center, and the North County Correctional Center. Persons charged with or convicted of crimes are in over one hundred different locations. The layers of administration and management between what happens in a jail are many and they are complex. To infer that specific incidents which occur in a jail are necessarily known by the Sheriff is to engage in fallacious logic.

This complexity does not absolve the Department of responsibility for respecting the constitutional rights and general well-being of its charges, but it does show how inappro-

priate it is to sue the Sheriff individually *unless* in terms of causation the Sheriff can be personally tied to the actionable behavior at issue. Just being a disappointing or even an insufficiently engaged public servant is not enough. Those issues are for the ballot box and the County Board of Supervisors, not the courts.

Judge Wu was clear and correct in his articulation of the complaint's deficiencies:

> What you need to do is state precisely what it is that you are claiming other than he's the general supervisor of the jail facility, and therefore, he can be sued individually if anything bad happens, because bad things have happened in the past at the jail. It has to be something more than that to give rise to a claim. That's what I want. I want you to state what precisely it is that he supposedly did wrong, and if it's a failure to supervise it can't be just a general failure of supervision. It has to be something that is specific. That's what I want.

Earlier in the same hearing, Starr's counsel said this, which is equally indicative of no facts, just "theory:"

> MR. PAZ: Your Honor, let me give you an analogy, Your Honor. All I can do is put it on the record and try to explain to the court the theory.
> It's no different than if we had the head of a hospital, and a surgeon five floors down below is killing people on a regular basis. If the head of the hospital doesn't act, then they will be liable.

Another concession appeared when counsel said, "We're still at the pleading stage where we are just saying do we have a right to go to Mr. Baca and do discovery and try to prove our

case." Counsel's statement here collides with what the Supreme Court said in *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937 (2009): "Rule 8 . . . does not unlock the doors for a plaintiff armed with nothing more than conclusions." *Id.* at 1949-50.

Sadly, bad things routinely happen in the best of jails. The same is true of hospitals, armies, churches, nursing homes, synagogues, boy scout troops, and legislatures. To attach personal legal liability to the leaders of these organizations, however, requires much more than, 'Well, she must have known and must have been deliberately indifferent, because after all, it happened on her watch.'

Accordingly, although we review this issue de novo, I agree with Judge Wu's end-of-the-process conclusion:

> The TAC [Third Amended Complaint], as compared to previous pleadings, adds no new allegations which adequately identifies [sic] the precise nature of Baca's misfeasance or nonfeasance or which establishes a sufficient causal link between Baca's actions or inaction and the alleged violation of plaintiff's constitutional rights.

> Nor does Plaintiff's opposition memorandum point to any language in the TAC which demonstrates such a causal connection. *Plaintiff does not allege that Baca himself directly participated in any way in the January 27, 2006 incident or that he was involved in any review or investigation of it. Likewise, Plaintiff has not cited to any specific policy implemented by Baca which was the "moving force [in] the constitutional violation." Plaintiff simply argues that he "has amply satisfied the second 'causal connection' prong by alleging facts which put Baca on notice of ongoing unconstitutional conduct of his subordinates*." However, the mere fact

that Baca may have known about prior incidents [that] allegedly occurred in the jail does not show that Baca has implemented a policy that is tantamount to a repudiation of constitutional rights.

Judge Fletcher's Opinion, with all respect, is difficult to reconcile with *Iqbal*. I extract portions of the *Iqbal* Opinion to illustrate my point:

> The allegations against petitioners are the only ones relevant here. The complaint contends that petitioners designated respondent a person of high interest on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments to the Constitution. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11." It further alleges that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." Lastly, the complaint posits that petitioners "each knew of, condoned, and willfully and maliciously agreed to subject" respondent to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." The pleading names Ashcroft as the "principal architect" of the policy, and identifies Mueller as "instrumental in [its] adoption, promulgation, and implementation."

*Id.* at 1944 (internal citations omitted) (alterations and omissions in original).

Respondent [Iqbal] . . . argues that, under a theory of "supervisory liability," petitioners can be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." That is to say, respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. In a § 1983 suit or a *Bivens* action-where masters do not answer for the torts of their servants-the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of [a] clearly established right to overcome qualified immunity, *purpose rather than knowledge is required to impose* Bivens *liability on the subordinate for unconstitutional discriminations; the same holds true for an official charged with violations arising from his or her superintendent responsibilities*.

*Id.* at 1949 (emphasis added) (internal citation omitted).

Two working principles underlie our decision in [*Bell Atlantic Corp. v.*] *Twombly* [550 U.S. 544 (2007)]. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Thread-bare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice*. *Id.*, at 555, 127 S. Ct. 1995 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, *we "are not*

*bound to accept as true a legal conclusion couched as a factual allegation*" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but *it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions*. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*Id.* at 1949-50 (emphasis added) (internal citations omitted) (second alteration in original).

We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth. Respondent pleads that petitioners "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." The complaint alleges that Ashcroft was the "principal architect" of this invidious policy, and that Mueller was "instrumental" in adopting and executing it. *These bare assertions, much like the pleading of conspiracy in* Twombly, *amount to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim*, namely, that petitioners adopted a policy " 'because of,' not merely 'in spite

of,' its adverse effects upon an identifiable group."
As such, the allegations are conclusory and not enti-
tled to be assumed true. To be clear, we do *not* reject
these bald allegations on the ground that they are
unrealistic or nonsensical. We do not so characterize
them any more than the Court in Twombly rejected
the plaintiffs' express allegation of a " 'contract,
combination or conspiracy to prevent competitive
entry,' " because it thought that claim too chimerical
to be maintained. It is the *conclusory nature* of
respondent's allegations, rather than their extrava-
gantly fanciful nature, that disentitles them to the
presumption of truth.

*Id.* at 1951 (emphasis added) (internal citations omitted)
(alterations in original).

Although *Iqbal* puts considerable meat on this wise rule's
bones, it is not new. In 1988, for example, we said in *Taylor
v. List*, a failed lawsuit against Nevada's Attorney General
and the Director of the Nevada State Prison alleging their
"knowledge of and failure to prevent the alleged constitu-
tional violations by their subordinates," the following:

Liability under section 1983 arises only upon a
showing of *personal participation* by the defendant.
A supervisor is only liable for constitutional viola-
tions of his subordinates if the supervisor partici-
pated in or directed the violations, or knew of the
violations and failed to act to prevent them.

880 F.2d 1040, 1043, 1045 (9th Cir. 1988) (emphasis added)
(internal citation omitted).

The days of pleading conclusions without factual support
accompanied by the wishful hope of finding something juicy
during discovery are over. Wisely, we have moved up judg-

ment day to the complaint stage rather than bog down the courts and parties with pre-summary judgment combat.

This conclusion, of course, does not leave Starr without redress. He may sue the Sheriff in his official capacity, which is the same as suing the County of Los Angeles and the Sheriff's Department, and he may pursue his lawsuit on the ground of official policy or longstanding custom and practice — but he may not sue the Sheriff individually just because he is the Sheriff. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *Community House, Inc. v. City of Boise*, 623 F.3d 945, 973 (9th Cir. 2010). The district court clearly understands this distinction:

> In other words, any time anything goes wrong of any sort Baca gets blamed and he can be individually liable as opposed to being liable [in his official capacity] as the agent of the county. I can understand that claim. There is no problem with that one, but you are suing him on an individual basis.

Given the amount of time and effort already devoted to trying to get the Sheriff into this case, I seriously doubt any additional facts will come forward. Thus, the next step is summary judgment. So be it.

Accordingly, I respectfully dissent.